STEPHENSON ET AL. *v.* BINFORD ET AL.

No. 326. Argued November 14, 15, 1932.—Decided December 5, 1932.

252

Mr. *John N. Crooker,* with whom *Messrs. Wm. B. Bates* and *Leon Jaworski* were on the brief, for appellants.

*Mr. LaRue Brown,* with whom *Messrs. L. E. Blanken-becker* and *Horace P. Moulton* were on the brief, for D. A. Beard, intervener-appellant.

256

*Mr. Elbert Hooper,* Assistant Attorney General of Texas, with whom *Messrs. James V. Allred,* Attorney General, *T. S. Christopher,* Assistant Attorney General, *Claude Pollard, J. H. Tallichet, Charles C. Huff, W. M. Streetman,* and *A. L. Reed* were on the brief, for appellees.

258

Mr. Justice Sutherland delivered the opinion of the Court.

This is a suit brought in the court below by Stephenson, one of the appellants, in which the other appellants intervened, against various officials of the State and counties of Texas, among them, the Governor, Attorney General, members of the State Highway Commission and of the

State Railroad Commission, to enjoin the enforcement of certain provisions of a state statute hereafter described. The appellants severally were engaged in transporting freight by means of motor trucks over the highways of the state, between certain cities located within the state, under private contracts made with various named shippers, which contracts, among other terms, fixed the rate to be charged for the transportation services. While these contracts were in force and in process of being performed, the state statute was passed, the effect of which, it is alleged, is to prohibit appellants from carrying out the terms, provisions and conditions of their contracts; to preclude them from transporting freight over the highways of the state under their contracts as private carriers to their great injury; and to subject them to criminal prosecutions. It is further alleged that an enforcement of the act will destroy the business of appellants, and unless restrained will cause them irreparable injury.

The following constitute the salient provisions of the act. Section 1 defines various terms used in the act. Section 3 provides that no common carrier of property for compensation or hire shall operate over the highways of the state without first obtaining a certificate of public convenience and necessity, and that no contract carrier shall thus operate without a permit so to do. Section 4 vests the railroad commission with authority to supervise and regulate the transportation of property for compensation or hire by motor vehicle on any public highway of the state; to fix maximum or minimum, or maximum and minimum, rates, fares and charges in accordance with the specific provisions of the act; to prescribe rules and regulations for the government of motor carriers, for the safety of their operations, and for other purposes; to require each driver to have a license pursuant to an examination as to his ability and fitness. By the same section the commission is given broad powers of supervision and

regulation in respect of matters affecting the relationship of the motor carriers and the shipping public, as may be necessary in the interest of the public; and also to supervise and regulate such carriers generally " so as to carefully preserve, foster and regulate transportation and to relieve the existing and all future undue burdens on the highways arising by reason of the use of the highways by motor carriers, adjusting and administering its regulations in the interests of the public." The railroad commission and the highway commission are directed to coöperate in respect of the condition of the public highways and their ability to carry existing and proposed additional traffic.

Section 5 contains various provisions relating to common carriers over the highways, and among other things requires them to have *certificates* of public convenience and necessity. Section 6 (a) provides that no motor carrier now operating as a contract carrier, or hereafter desiring to engage in so doing, shall operate until it shall have received a *permit* from the railroad commission which shall not be issued until the applicant has complied with the requirements of the act. Section 6 (c) directs that such permits shall be granted only after a hearing, and not if the commission be of opinion " that the proposed operation of any such contract carrier will impair the efficient public service of any authorized common carrier or common carriers then adequately serving the same territory."

Section 6 (d) authorizes the railroad commission to issue special permits to persons desiring to transport for hire over the state highways livestock, mohair, wool, milk, and certain other commodities, upon such terms and under such regulations as may be deemed proper, having in mind the protection of the highways and the safety of the traveling public. Section 6aa gives the commission authority to prescribe rules and regulations governing the operation of contract carriers in competition with com-

mon carriers over the highways, and to prescribe minimum rates to be collected by such contract carriers " which shall not be less than the rates prescribed for common carriers for substantially the same service."

Section 6bb provides that no permit to operate as a contract carrier shall be granted to any person operating as a common carrier holding a certificate of convenience and necessity, and that no certificate of convenience and necessity shall be granted to any person operating as a contract carrier, and that no vehicle shall be operated by any motor carrier with both a permit and a certificate.

Section 13 requires all motor carriers to give bonds and insurance policies, which among other things shall provide that the obligor will pay judgments recovered against the motor carrier based on claims for loss or damages for personal injuries, or " loss of, or injury to, property occurring during the term .of said bonds and policies and arising out of the actual operation of such motor carrier." The section contains a proviso directing the Commission not to require insurance covering loss of or damage to cargo in amount excessive for the class of service to be rendered by the carrier.

Section 22(b) is a broad declaration of policy. It declares that the business of operating as a motor carrier of property for hire along the highways of the state is one affected with the public interest. It further declares that the rapid increase of motor carrier traffic and the lack of effective regulation have increased the dangers and hazards on public highways and made more stringent regulations imperative to the end that the highways may be rendered safer for public use, the wear and tear upon them reduced, discrimination in rates eliminated, congestion of traffic minimized, the use of the highways for transportation of property for hire restricted to the extent required by the necessities of the general public, and the various transportation agencies of the state adjusted and

correlated "so that public highways may serve the best interest of the general public."

The case was heard by a statutory court consisting of three judges, under § 266 of the Judicial Code, U. S. C., Title 28, § 380, upon the pleadings and affidavits and other evidence. That court delivered an opinion and denied an interlocutory injunction. 53 F. (2d) 509. Later, and upon final hearing, the court made findings of fact and entered a decree denying a permanent injunction. The case comes here by appeal from that decree.

Appellants assail the statute upon the following grounds. (1) That as applied to appellants, all of whom are private contract carriers, the result of the statute is to compel them to dedicate their property to the quasi-public use of public transportation before they can operate their motors over the highways, and thus to take their property for public use without adequate compensation and to deprive them of their property without due process of law. In other words, the alleged effect of the statute is to convert the private carriers into common carriers by legislative fiat. (2) That the business of appellants is not affected with a public interest, and the provisions of the statute so declaring in terms, or in effect, constitute an attempt to deprive appellants of their property without due process of law, and to abrogate their right of private contract. (3) That the statute by requiring appellants to obtain a permit in the nature of a certificate of public convenience and necessity subjects them to other regulations before they can lawfully operate upon the highways, which regulations are not imposed upon other private carriers similarly situated, and thereby appellants are denied the equal protection of the laws. (4) That other regulations to which appellants are subjected are not made applicable to persons using the highways in transportation of their own commodities under substantially similar conditions,

and thereby appellants are denied the equal protection of the laws.

To these contentions appellees reply—(a) That the act does not undertake to convert the contract carriers into common carriers, or to require them to devote their property to any different or greater public use than that to which they have already voluntarily dedicated it, or to render any service beyond that which they have contracted to render, but merely fixes reasonable conditions upon the permissive use which they make of public property as a place of business. (b) That the act is bottomed upon the state's power to protect its highways and remove traffic hazards, as well as upon its power and duty to foster and preserve a dependable transportation system for the whole people. (c) That the contract carriers reached by the act are, under conditions now obtaining upon the highways, engaged in a business affected with a public interest, and the reasonable regulation of their rates and practices is essential for the protection of that interest. (d) That the act is not discriminatory in the particulars asserted by appellants.

*First.* It is well established law that the highways of the state are public property; that their primary and preferred use is for private purposes; and that their use for purposes of gain is special and extraordinary, which, generally at least, the legislature may prohibit or condition as it sees fit. *Packard* v. *Banton,* 264 U. S. 140, 144, and cases cited; *Frost Trucking Co.* v. *Railroad Comm.,* 271 U. S. 583, 592–593; *Hodge Co.* v. *Cincinnati,* 284 U. S. 335, 337; *Johnson Transfer & Freight Lines* v. *Perry,* 47 F. (2d) 900, 902; *Southern Motorways* v. *Perry,* 39 F. (2d) 145, 147; *People's Transit Co.* v. *Henshaw,* 20 F. (2d) 87, 89; *Weksler* v. *Collins,* 317 Ill. 132, 138–139; 147 N. E. 797; *Maine Motor Coaches* v. *Public Utilities,* 125 Me. 63, 65; 130 Atl. 866.

Putting aside the question whether the statute may stand against the attack made under the due process of law clause, upon the theory that appellants, by reason of their use of the public highways, are engaged in a business impressed with a public interest, and the question whether it may be justified on the ground that, wholly apart from its relation to highway conservation, it is necessary in order to prevent impairment of the public service of authorized common carriers adequately serving the same territory, we confine our inquiry to the question whether, in the light of the broad general rule just stated, the statute may be construed and sustained as a constitutional exercise of the legislative power to regulate the use of the state highways. Provisions of the statute assailed on the ground that they are not highway regulations and violate the due process of law clause are: the requirement that the private contract carrier before engaging in business must obtain a permit upon considerations relating to the effect of their competition upon existing common carriers; the provision authorizing the railroad commission to fix the minimum rates of such private carriers operating in competition with common carriers, which shall not be less than the rates prescribed for common carriers for substantially the same service; and the requirement, as appellants interpret the statute, that such private carriers must furnish cargo insurance policies and bonds.

We are of opinion that neither by specific provision or provisions, nor by the statute considered as a whole, is there an attempt to convert private contract carriers by motor into common carriers. Certainly, the statute does not say so. Common carriers by motor and private contract carriers are classified separately and subjected to distinctly separate provisions. By § 1 (h), the contract carrier is defined as " any motor carrier . . . transporting

property for compensation or hire over any highway in this state *other than as a common carrier."* It is difficult to see how the legislature could more clearly have evinced an intention to avoid an attempt to convert the contract carrier into a common carrier. It is true that the regulations imposed upon the two classes are in some instances similar if not identical; but they are imposed upon each class considered by itself, and it does not follow that regulations appropriately imposed upon the business of a common carrier, may not also be appropriate to the business of a contract carrier.

Appellants, in support of their contention, rely upon prior decisions of this court; but there is nothing in any of them, as a brief review will disclose, which requires us to hold that the legislation here under review compels private contract carriers to assume the duties and obligations of common carriers, or interferes with their freedom to limit their business to that of carrying under private contracts as they have been wont to do.

*Michigan Commission* v. *Duke,* 266 U. S. 570, dealt with a state law which expressly provided that all persons engaged in the transportation of persons or property for hire by motor vehicle upon the public highways of the state should be common carriers, and that all laws of the state regulating transportation by other common carriers should apply with equal force and effect to such common carriers. It was upon this *express* provision that this court based its holding (pp. 577-578) that it was beyond the power of the state by legislative fiat to convert property used exclusively in the business of a private carrier into a public utility, or to make the owner a public carrier, since that would be to take private property for public use without just compensation in violation of the due process of law clause of the Fourteenth Amendment.

*Buck* v. *Kuykendall,* 267 U. S. 307, and *Bush Co.* v. *Maloy,* 267 U. S. 317, were cases which dealt with state

statutes affecting interstate commerce and with discriminations relating thereto. No such questions are raised in respect of the application to appellants of the Texas statute now under consideration.

The question decided in *Frost Trucking Co.* v. *Railroad Commn.*, 271 U. S. 583, differs entirely from that here presented. There (p. 592) the California supreme court had construed a provision of the state statute which required the private contract carrier to obtain not a permit, as here, but a certificate of public convenience and necessity, before doing business over the state highways, as a condition obliging him to dedicate his property to the business of public transportation and to subject himself to all the duties and burdens imposed by the act upon common carriers. This court, in accordance with the settled rule, accepted that construction as binding and, in that view, said (p. 592):

". . . the case presented is not that of a private carrier who, in order to have the privilege of using the highways, is required merely to secure a certificate of public convenience and become subject to regulations appropriate to that kind of a carrier; but it is that of a private carrier who, in order to enjoy the use of the highways, must submit to the condition of becoming a common carrier and of being regulated as such by the railroad commission. The certificate of public convenience, required by § 5, is exacted of a common carrier and is purely incidental to that status. The requirement does not apply to a private carrier *qua* private carrier, but to him only in his imposed statutory character of common carrier. Apart from that signification, so far as he is concerned, it does not exist."

On the contrary, the Texas statute in respect of permits deals exclusively with the private contract carrier, and requires the issue of the permit not to him in the imposed character of a common carrier, but in his actual character

as a private contract carrier. If the California statute requiring a certificate had been thus interpreted by the highest court of the state, the foregoing quotation clearly suggests that our decision might have been otherwise.

*Smith* v. *Cahoon*, 283 U. S. 553, dealt with a Florida statute indiscriminately applying to all who operated motor vehicles for compensation or as common carriers over public highways, and prohibiting such operation without a certificate of public convenience and necessity, application for which was to be accompanied by a schedule of tariffs. No certificate was valid unless a bond were given by the applicant for protection against injuries resulting from negligence, and for the protection of persons and property carried. The railroad commission was vested with authority to fix or approve rates, regulate service, prescribe methods of keeping accounts, etc. Schedules of rates were to be open to the public, and all alterations in tariffs were under the commission's control. The violation of any provision of the act was made a misdemeanor punishable by fine or imprisonment or by both. This court held that since the statute affixed the same conditions to all who applied for certificates, and embraced in those conditions a scheme of supervision and control which constitutionally could be applied only to common carriers, a private carrier for hire could not constitutionally be arrested under it for failure to procure a certificate or pay the tax required by the act. It further held that if the statute were regarded as intended to afford one constitutional scheme for common carriers and another for private carriers, it failed to define the obligations of private carriers with the certainty required of criminal statutes, and was, therefore, void; and that this defect was not removed by a decision of the state court declaring the provisions separable and that only those legally applicable to private carriers were intended to apply to them, without also deciding which provisions were so applicable. " No separate

scheme of regulation," we said (p. 563), " can be discerned in the terms of the Act with respect to those considerations of safety and proper operation affecting the use of highways which may appropriately relate to private carriers as well as to common carriers."

The vice of the statute was that all carriers for hire, whether public or private, were put upon the same footing by explicit provisions which could not be severed so as to afford one valid scheme for common carriers and another for private carriers, with the result that until the separability of these provisions should be determined by competent authority, they were void for uncertainty. In the Texas statute no such uncertainty exists. The provisions intended to be applicable to contract carriers are distinctly set forth and separately stated, plainly leaving for determination only the question whether such provisions, or any of them, are invalid as so applied. *Continental Baking Co.* v. *Woodring,* 286 U. S. 352, 364.

We come, then, to consider the challenged provisions of the statute under review, in the light of their exclusive relation to contract carriers, unembarrassed by any previous ruling of this court. In view of the conclusions to which we shall come, it is not necessary to determine whether the operation of trucks for the transportation of freight under private contracts, carried into effect by the use of the public highways, is a business impressed with a public interest.

There is ample support in the record for the following findings of the court below:

" The evidence shows there are 1,360,413 motor vehicles other than either common or contract carriers or commercial carriers of passengers registered for use on the highways of Texas, and that it is one of the purposes of the Legislature to make the use of the highways safer and more convenient for these private operators, involving incidentally either a lessening of commercial transporta-

tion on the highways, or such improvement in their character and practices as to effect the same result. In this connection, the Court finds that the provisions of the statute carried out in accordance with the declaration of purpose and the specific instructions therein will have the effect either of lessening commercial traffic on the highways, or, by bringing it under careful and adequate supervision, of making the use thereof by the very large number of owners and operators of private motor vehicles safer and more convenient.

" The increase of unregulated truck transportation over the highways had developed a difficult and perplexing public problem to the extent that the Governor of the State in his message to the Legislature called attention to the fact that the highways were being taken and badly used by motor vehicles engaged in the transportation of freight for hire.

" The number of contract carriers on the highways of Texas having rapidly grown, as elsewhere found, the business they conduct now exists as a very large factor in commercial transportation. The court finds that it is not the effect of one such carrier or a limited number thereof which produced the serious problem with which the Legislature of Texas purported to deal and has dealt, but it is the effect, in the aggregate, of such contract carriers that is important.

.        .        .        .        .        .

" The inevitable result of the continuance of the enormous increase of so-called private carriers for hire and the continual decrease in the number of common carriers holding certificates of public convenience and necessity will be the practical disappearance altogether of common carriers from the roads.

" The Legislature has declared that all of the available carriage service, including common carriage by rail and road and contract carriage by road, are so interdependent

that the public may not continue to have a safe and dependable transportation system unless private carriers operating on the same roads with common carriers are brought under just and reasonable regulations bringing their service into relation with common carriers, and we find the evidence supports this finding.

" The requirement of the Texas statute under attack that contract carriers must have a permit with the prerequisites in the statute for such a permit, is reasonable, particularly in that this method enables the State to know who will use its highways and to more efficiently regulate such use. The permit system has immediate relation to the condition of the roads and bridges, congestion of the highways and the character of equipment to be used, which relates not only to the effect of the operations on business but also to the problem of safety and convenience in use of the highway.

" The experience of the Railroad Commission supports the Legislative declaration that unregulated contract carriers under the former law effectively prevents the primary purpose of fostering and conserving for the public welfare all commercial transportation on the highways which it has been the purpose of the laws of Texas, under rules of the Commission, to foster."

These and other findings and the evidence contained in the record conclusively show that during recent years the unregulated use of the highways of the state by a vast and constantly growing number of private contract carriers has had the effect of greatly decreasing the freight which would be carried by railroads within the state, and, in consequence, adding to the burden upon the highways. Certainly, the removal or amelioration of that burden, with its resulting injury to the highways, interference with their primary use, danger and inconvenience, is a legitimate subject for the exercise of the state legislative power. And that this was one of the chief ends sought

to be accomplished by the provisions in question, the record amply establishes.

The assailed provisions, in this view, are not ends in and of themselves, but means to the legitimate end of conserving the highways. The extent to which, as means, they conduce to that end, the degree of their efficiency, the closeness of their relation to the end sought to be attained, are matters addressed to the judgment of the legislature, and not to that of the courts. It is enough if it can be seen that in any degree, or under any reasonably conceivable circumstances, there is an actual relation between the means and the end. Compare *McCulloch* v. *Maryland*, 4 Wheat. 316, 409–410, 419, 421, 423; *Veazie Bank* v. *Fenno*, 8 Wall. 533, 549; *Legal Tender Cases*, 12 Wall. 457, 539–540, 541, 542, 543; Pomeroy, Constitutional Law, 9th ed., § 268a.

Turning our attention then to the provision for permits, it is to be observed that the requirement is not that the private contract carrier shall obtain a certificate of public convenience and necessity, but that he shall obtain a permit, the issue of which is made dependent upon the condition that the efficiency of common carrier service then adequately serving the same territory shall not be impaired. Does the required relation here exist between the condition imposed and the end sought? We think it does. But in any event, if the legislature so concluded, as it evidently did, that conclusion must stand, since we are not able to say that in reaching it that body was manifestly wrong. *Jacobson* v. *Massachusetts*, 197 U. S. 11, 30–31. Compare *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 395; *Zahn* v. *Board of Public Works*, 274 U. S. 325, 328. Debatable questions of this character are not for the courts, but for the legislature, which is entitled to form its own judgment. *Sproles* v. *Binford,* 286 U. S. 374, 388–389. Leaving out of consideration common carriers by

trucks, impairment of the railway freight service, in the very nature of things, must result, to some degree, in adding to the burden imposed upon the highways. Or stated conversely, any diversion of traffic from the highways to the railroads must correspondingly relieve the former, and, therefore, contribute directly to their conservation. There is thus a substantial relation between the means here adopted and the end sought. This is made plain by the *Sproles* case, *supra* (p. 394):

" The State has a vital interest in the appropriate utilization of the railroads which serve its people, as well as in the proper maintenance of its highways as safe and convenient facilities. The State provides its highways and pays for their upkeep. Its people make railroad transportation possible by the payment of transportation charges. It cannot be said that the State is powerless to protect its highways from being subjected to excessive burdens when other means of transportation are available. The use of highways for truck transportation has its manifest convenience, but we perceive no constitutional ground for denying to the State the right to foster a fair distribution of traffic to the end that all necessary facilities should be maintained and that the public should not be inconvenienced by inordinate uses of its highways for purposes of gain. This is not a case of a denial of the use of the highways to one class of citizens as opposed to another, or of limitations having no appropriate relation to highway protection."

What has just been said applies in the main to the other challenged provision authorizing the commission to prescribe minimum rates not less than those prescribed for common carriers for substantially the same service. This provision, by precluding the contract carriers from rendering service at rates under those charged by the railroad carriers, has a definite tendency to relieve the highways by

274

diverting traffic from them to the railroads. The authority is limited to the fixing of minimum rates. The contract carrier may not charge less than the rates so fixed, but is left free to charge as much more as he sees fit and can obtain. Undoubtedly, this interferes with the freedom of the parties to contract, but it is not such an interference as the Fourteenth Amendment forbids. While freedom of contract is the general rule, it is nevertheless not absolute but subject to a great variety of legitimate restraints, among which are such as are required for the safety and welfare of the state and its inhabitants. *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13, 22; *Atlantic Coast Line R. Co.* v. *Riverside Mills,* 219 U. S. 186, 202; *Chicago, B. & Quincy R. Co.* v. *McGuire, id.,* 549, 567, *et seq.; Baltimore & Ohio R. Co.* v. *Int. Com. Commn.,* 221 U. S. 612, 619. When the exercise of that freedom conflicts with the power and duty of the state to safeguard its property from injury and preserve it for those uses for which it was primarily designed, such freedom may be regulated and limited to the extent which reasonably may be necessary to carry the power and duty into effect. Compare *McLean* v. *Arkansas,* 211 U. S. 539, 545; *Miller* v. *Wilson,* 236 U. S. 373, 380; *Frisbie* v. *United States,* 157 U. S. 160, 165; *Highland* v. *Russell Car Co.,* 279 U. S. 253, 261; *Adkins* v. *Children's Hospital,* 261 U. S. 525, 546.

Here the circumstance which justifies what otherwise might be an unconstitutional interference with the freedom of private contract is that the contract calls for a service, the performance of which contemplates the use of facilities belonging to the State; and it would be strange doctrine which, while recognizing the power of the state to regulate the use itself, would deny its power to regulate the contract so far as it contemplates the use. " Contracts which relate to the use of the highways must be deemed to have been made in contemplation of the regulatory authority of the State." *Sproles* v. *Binford, supra,*

at pp. 390–391, and authorities cited. The principle that Congress may regulate private contracts whenever reasonably necessary to effect any of the great purposes for which the national government was created, *Highland* v. *Russell Car Co., supra,* at p. 261, applies to a state under like circumstances.

An entirely different question was presented in the *Frost Trucking* case, *supra.* There, as we pointed out (pp. 591–592), the California act, as construed by the highest court of the state, was in no real sense a regulation of the use of the public highways. Its purpose was to protect the business of those who were common carriers in fact by controlling. competitive conditions. Protection or conservation of the highways was not involved.* The condition which constrained the private contract carrier to become a common carrier, therefore, had no relation to the highways. In this view, the use of the highways furnished a purely unrelated occasion for imposing the unconstitutional condition, affording no firmer basis for that condition than would have been the case if the contract carrier were using a road in private ownership.

The Texas statute, on the contrary, rests definitely upon the policy of highway conservation, and the provision now under review is governed by the same principle as that which recognizes the authority of a state to prescribe the conditions upon which it will permit public work to be done on its behalf. Among such conditions it may prescribe that laborers employed by a contractor to do such work shall not be permitted to labor more than eight hours per day. *Atkin* v. *Kansas,* 191 U. S. 207. " It cannot be deemed a part of the liberty of any contractor," it is said at pp. 222–223, " that *he* be allowed to do public work in any mode he may choose to adopt,

---

* The California Supreme Court expressly said that the act " does not purport to be and is not in fact a regulation of the *use* of the highways." 197 Cal. 230, 244; 240 Pac. 26.

without regard to the wishes of the State. On the contrary, it belongs to the State, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern." See also *Ellis* v. *United States,* 206 U. S. 246, 256; *Heim* v. *McCall,* 239 U. S. 175, 191. It may be said with like force that it belongs to the state, " as master in its own house," to prescribe the terms upon which persons will be permitted to contract in respect of the use of the public highways for purposes of gain. See *Hodge Co.* v. *Cincinnati,* 284 U. S. 335, 337.

We need not consider whether the act in some other aspect would be good or bad. It is enough to support its validity that, plainly, one of its aims is to conserve the highways. If the legislature had other or additional purposes, which, considered apart, it had no constitutional power to make effective, that would not have the result of making the act invalid. *Ellis* v. *United States,* 206 U. S. 246, 256. Nor does it matter that the legislation has the result of modifying or abrogating contracts already in effect. Such contracts are to be regarded as having been made subject to the future exercise of the constitutional power of the state. *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467, 480, *et seq.; Union Bridge Co.* v. *United States,* 204 U. S. 364, 400; *Sproles* v. *Binford, supra,* at pp. 390–391.

The provision of § 13, requiring every motor carrier, whether operating under permit or certificate, to furnish a bond and policy of insurance conditioned that the obligor will pay, among other things, for loss of, or injury to, property arising out of the actual operation of the carrier, is construed by appellants as including car-

goes carried by them, and is assailed as a requirement bearing no relation to public safety, but as an attempt to condition the purely private contractual relationship between shipper and private carrier. It is said that the proviso which prohibits the commission from requiring insurance covering loss of, or damage to, *cargo* in an excessive amount requires the construction suggested. So far as appears no attempt yet has been made to enforce the provision against any of these appellants, and until that is done they have no occasion to complain. Moreover, no state court thus far has dealt with the question, and unless obliged to do otherwise, we should not adopt a construction which might render the provision of doubtful validity, but await a determination of the matter by the courts of the state. *Utah Power & L. Co.* v. *Pfost,* 286 U. S. 165, 186.

*Second.* The contention that the act, in certain particulars, denies appellants the equal protection of the laws requires only brief consideration. Section 6 (d), which authorizes the issue of special permits to persons engaged in the business of transporting certain named commodities upon such terms, conditions and restrictions as the railroad commission may deem proper, etc., is said to discriminate arbitrarily against carriers of commodities of a similar character, in that the selected carriers are not required to comply with many of the onerous provisions of the statute. It is by no means clear that such is the case, and it is asserted on behalf of appellees, and not disputed, that the Attorney General of the state, in an official opinion, has construed the provision to mean that persons operating under these special permits either as contract or common carriers are subject to the provisions of the act applicable to such carriers, and that this construction has been accepted by the railroad commission. There is nothing in the record to suggest that the provision has been otherwise applied. Appellants in this

regard, therefore, have no ground upon which to base a complaint.

Nor do we find merit in the further contention that the act arbitrarily discriminates against appellants because it does not apply to persons, commonly known as " shipper-owners," who are transporting their own commodities under substantially similar conditions. It is obvious that certain provisions of the statute, like that requiring the commission to fix minimum rates, can have no application to such owners. We are of opinion, from an examination of the act and the companion act which was upheld by this court in *Sproles* v. *Binford, supra,* that all provisions relating to contract carriers which are germane to shipper-owners are made applicable to them. In any event, it is not shown that the act thus far has been so administered as to result in any unlawful discrimination.

The decree of the court below is

*Affirmed.*

Mr. Justice Butler dissents.