**TEXAS & P. RY. CO. et al. v. RAILROAD COMMISSION et al.**
No. 8898.

Court of Civil Appeals of Texas. Austin.
March 27, 1940.

Rehearing Denied April 10, 1940.

928

R. S. Shapard, C. C. Huff, and Adair Dyer, all of Dallas, Baker, Botts, Andrews & Wharton and Andrews, Kelley, Kurth & Campbell, all of Houston, Terry, Cavin & Mills, of Galveston, and Herbert L. Smith, of Austin, for appellants.

Gerald C. Mann, Atty. Gen., Geo. W. Barcus, Asst. Atty. Gen., Albert S. Rollins, and Judge Ocie Speer, Asst. Attys. Gen. (Shaw & Kirkpatrick, of Houston, of counsel), for appellees.

BAUGH, Justice.

This suit was filed by six railroad companies operating in Texas, and one common carrier motor carrier of freight over the highways, against the Railroad Commission and Thomas G. Hunter to set aside a special commodity permit granted by the Commission to Hunter on March 8, 1937, under the provisions of Sec. 6(d) of the Motor Carrier Law as amended by the Acts of 1937, 45 Leg., p. 651, Ch. 321, Vernon's Ann.Civ.St. art. 911b, § 6(d). Trial was to the court without a jury upon an agreed statement of facts, and the plaintiffs denied any relief; hence the appeal.

The permit in question, granted after due notice and hearing, provided:

"Thomas George Hunter   of Texarkana, Texas.
(Name of Applicant)   (Address)
having complied with all the requirements of Chapter 314, Acts, Regular Session of the Forty-first Legislature, 1929, as amended at the Regular Called Session of the Forty-second Legislature, 1931, applicable to Special Contract Carriers and having declared an intention not to operate as a 'Common Carrier' or 'Contract Carrier' Motor Carrier is entitled to and is hereby granted a permit to operate as a Special Commodity Carrier within the State of Texas and within the territory as follows:

"It is especially understood and agreed that this permit authorizes the transportation of the following commodities only:

"Household goods from Texarkana, Texas, to all points in Texas and from all points in Texas to Texarkana, Texas.

"Livestock, Livestock Feed Stuffs, Timber when in its natural state, Farm Machinery and Grain from Texarkana, Texas to all points within a radius of 200 miles therefrom and vice versa. Oilfield equipment to and from all points within a 200 mile radius of Texarkana, Texas.

"The transportation of all commodities with the exception of Household goods is prohibited over the following restricted highways.
* * *"

Here follows nine State highways over which operations were prohibited.

"The transportation of household goods, livestock feedstuffs, farm machinery and grain is prohibited from one dealer to another dealer.

"The transportation of oilfield equipment is restricted to that transported to or from actual oil fields, and the carrier is prohibited from transporting same from one dealer or refinery to another dealer or refinery, or from a dealer to a refinery or from a refinery to a dealer.

"All equipment to be operated under authority of this permit is to be restricted exclusively to that owned by· the holder of such permit and shall not exceed *one truck.*
as more fully appears in this application filed herein. This permit to remain in effect from and after the date hereof, subject to the provisions of Chapter 314, Acts Regular Session of the Forty-first Legislature, 1929, as amended at the Regular Session of the Forty-second Legislature, 1931; the further orders of the Commission; and the rules and regulations of the Railroad Commission of Texas, heretofore prescribed or which may be hereafter prescribed under and pursuant to the authority conferred upon it by law."

It is not controverted that in granting such permit the Commission heard evidence upon, and considered, only whether the condition of the highways and use thereof by the public would permit the additional burden imposed by Hunter's operations. That is, they did not consider the public convenience and necessity for such service; nor whether other motor carriers already authorized were adequately serving the territory involved.

In the hearing before the examiner for the Railroad Commission, appellants objected to Hunter's application on the ground that it did not comply with the re-quirements of the Motor Carrier Act (Acts Reg.Sess. 42nd Leg. Ch. 277, p. 480, Vernon's Ann.Civ.St. art. 911b) applicable to common carriers and contract carriers. They also offered to show, and were denied the opportunity to do so, that public convenience and necessity did not require such additional service over the highways; and that existing authorized carriers were already adequately serving this territory.

While many questions are urged, the validity of said permit depends, in the last analysis, upon a proper construction of Sec. 6(d) of the Act under which the permit was granted. This section of the 1931 Act provides: "(d) The Railroad Commission is hereby given authority to issue upon application to those persons who desire to engage in the business of transporting for hire over the highways of this State live stock, mohair, wool, milk, live stock feed stuffs, household goods, oil field equipment, timber when in its natural state, farm machinery and grain special permits upon such terms, conditions and restrictions as the Railroad Commission may deem proper, and to make rules and regulations governing such operations keeping in mind the protection of the highways and the safety of the traveling public; * * *."

The only change in this section made by the Acts of 1937, was to add, "used office furniture and equipment," to the list of commodities named in the 1931 Act. We confine our consideration therefore primarily to the 1931 Act.

The original Motor Carrier Act referred to in said permit (Ch. 314, Acts 41st Leg. 1929, p. 698) prescribed two classifications covering, and without any material exceptions, all transportation of freight for hire by motor carrier over the highways. Class "A" included all such carriage over the highways "over fixed routes, under regular schedules and having fixed termini and receiving compensation or hire for such service in accordance with published rates and tariffs." Class "B" carriers as defined in that Act included all "motor carriers who transport or carry property for compensation or hire between two or more incorporated cities, towns or villages, but who have no fixed routes regular schedules or fixed termini or published rates." Both classes therein made were declared by Sec. 2 of that Act to be "common carriers." Whether the 1929 Act was invalid, in the light of the decisions of the U. S. Supreme· Court, set out and discussed in Stephenson

v. Binford, 287 U.S., 251, 53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721, as attempting by legislative fiat to make common carriers out of private carriers irrespective of the service rendered, we need not here determine. It is to be noted that the 1931 Act does not undertake to do so.

The 1931 Act was obviously intended to cover and regulate every character of motor carriage of freight for hire over the highways. It denominates one class of carrier as "common carriers," though it nowhere undertakes to define that term; and the other class as "contract carriers," which it defines as any such motor carrier other than a common carrier. The definition of the term "motor carrier" in Sub. (g), Sec. 1, of the Act is clearly comprehensive enough to include within that term any and every class or type of carrier for hire over the highways of the State.

The authority of a common carrier under said Act to operate over the highways is evidenced by a certificate of public convenience and necessity. See Sec. 5. Sec. 9 of said Act prescribes the conditions on which such certificate may be issued and what the Commission shall take into consideration in granting it. Sec. 10 prescribes what the application for such a certificate shall contain. Among other things specifically set forth in the Act, the Commission must consider whether the "service rendered by existing transportation facilities or agencies is reasonably adequate"; and the application therefor must point out the "inadequacy of existing transportation facilities or service."

Contract carriers, a distinct and separate class from common carriers, must obtain a "permit" to operate as such. Sec. 6 prescribes the requisites of an application therefor and Sub. (3) (c) of that Section forbids the granting of such permit if operation thereunder "will impair the efficient public service of any authorized common carrier or common carriers then adequately serving the same territory." And where authorized contract carriers operate in competition with common carriers the Commission must prescribe minimum rates, fares and charges for such services which must not be lower than those prescribed for common carriers for substantially the same service. See Sec. 6-aa.

Sec. 4 of the Act also makes it the duty of the Commission in the regulation of authorized transportation for hire over the highways, among other things, "to fix, prescribe or approve the maximum or minimum or maximum and minimum rates, fares and charges of *each motor carrier*" (italics ours) in accordance with the other provisions of the Act.

In brief, when the Act is considered in its entirety, it imposes upon the Commission the mandatory duty, where the physical structure of the highways and the safety and convenience of the public will permit such transportation of freight for hire over them, to so regulate, control, and limit such motor transportation to the needs of the public; and to so regulate and control same as not to impair existing operations thereon, whether by private carrier or by common carrier. It negatives any intention to permit the use of such highways for freight transportation for hire unless such use will serve a public purpose or need, and will not impair the service already authorized and regulated over such highways.

It is long since settled that the permission and regulation of such operations over the highways must not be discriminatory. While under certain circumstances, exemptions to justifiable classifications, or certain exceptions, to regulation of motor carriage of freight for hire may be granted; the grounds therefor must be reasonable and a substantial basis therefor exist. Sec. 6(d), above quoted, does not expressly exempt carriers of the commodities therein named from the other provisions of the Act. While a legislative intent to do so might be implied, it is by no means clear. Had the legislature so intended it could easily have so stated. On the other hand, the declared purposes of the act and the plain and comprehensive language of the other provisions of the Act, manifest an intention to include within its terms any and every class and kind of motor carrier for hire, whether common carrier or private carrier; and many of the provisions of the Act apply equally to both.

Development of motor transportation in the past two decades, and the increasing use of the highways for commercial purposes by both common and private carriers, with consequent safety hazards and impairment of road beds, has necessitated stringent regulation thereof in the public interest. The primary objective and reasons therefor were to protect the safety and convenience of the public in the use thereof, and to preserve the highways them-

selves, constructed with the tax payers money. But these were not the only purposes sought in such regulation. The Act in question clearly discloses the additional purposes of preserving other established lines of transportation, and even though a public need be shown for additional operation, a further studied effort is shown to prevent, through regulation, unfair, discriminatory, or destructive competition between such authorized carriers as would ultimately impair their usefulness.

In the main, the Supreme Court of the United States has considered the regulated motor carriers under two classifications,— common carriers and private carriers. Under the latter, a great variety of classifications are to be found; and in the different states various types of motor carriers are exempted from the regulatory acts; or are regulated only to a limited extent. To relieve any particular class of motor carrier for hire from the regulations applicable to the general class to which it belongs, the classification must not be discriminatory, must be clear and specific, and must have a reasonable basis of differentiation from the general classification to sustain it. Otherwise it becomes invalid as contravening the due process and equal protection provisions of the Federal and State Constitutions.

█ We do not understand appellants to contend that Sec. 6(d) is unconstitutional. But rather that the Railroad Commission's construction of it is erroneous; and that such construction of it by the Commission renders it discriminatory. We have concluded that the Commission has erroneously construed this Section of the Act. If Sec. 6(d) clearly means what the Commission construes it to mean, it is, we think, invalid as discriminatory. This provision does not expressly exempt such carriers of the special commodities named from the other provisions of the 1931 Act. Nor is it necessary for us to determine whether Hunter be classed as a common carrier or a contract carrier. He was regulated to a limited extent under the permit granted. But we find no more reason, in the language of this particular section, for exempting him from the burden of showing a necessity for the service he proposed to render, that existing facilities in this area were inadequate, and that the proposed operations would not impair existing services; than for requiring him to comply with other sections of the Act, e. g., Sec. 13, re-

quiring insurance for motor carriers for hire. The language of Sec. 6(d) makes no specific reference to any of these provisions. And if the language of this Section alone be looked to, no more reason appears for applying Sec. 13 of the Act to such applicants than for applying other applicable provisions. The mere recital that in passing upon an application for such special permit, "the protection of the highways and the safety of the traveling public" is to be kept in mind by the Railroad Commission, should not be construed to mean that this was the only applicable provision of the Act that the Commission was required to consider in passing upon such application.

When this 1931 Act was before, and was sustained by, the Supreme Court of the United States in Stephenson v. Binford, supra, the opinion in that case shows that this Sec. 6(d) was attacked as rendering the Act invalid because discriminatory; and that the Attorney General therein asserted that the other provisions of said Act applied equally to such special commodity carriers.

We are not to be understood as saying that the legislature could not make special classifications of commodities which could be excluded from the more onerous burdens of the Act in question. As above stated, its purpose to do so is not clear. If, as urged by appellees, such was the intent and result of Sec. 6(d), the effect would, we think, result in discrimination against other motor carriers. As to household goods, the permit authorized such service from Texarkana to all points in Texas, and from all points in Texas to Texarkana. This regardless of whether a shipper thereof already had available to him between such points adequate common carrier or contract carrier service; and regardless of the effect such service by Hunter might have upon the existing transportation agencies. As to this service only were rates prescribed by the Commission at the time the permit was granted. As to the other commodities named the area to be served extended 200 miles, with certain highways excepted, from Texarkana; and the agreed statement of facts showed that Hunter would haul, upon any terms he saw fit for anyone who would employ him, except as limited in said permit, any of said commodities over the highways, regardless of whether other regulated carriers could and would render the same service; and regardless of the effect

the rates he saw fit to charge might have upon such regulated competing carriers over the highways in this area. This is particularly true of feedstuffs, which, it was agreed, he would haul from as far as Fort Worth to a large mule barn at Texarkana. It is manifest, we think, that a permit to do so without regulation as to rate, and without regard to the ability of existing carriers in this area to render the same service, would amount to a discrimination in favor of Hunter, and deny to other regulated carriers equal protection of law. Such a construction of this section of the Act would render it invalid.

■ On the other hand, if it be construed, as the Attorney General construed it in the presentation of the case of Stephenson v. Binford, supra, to the Supreme Court of the United States, as subjecting this class of carriers to the other applicable provisions of the 1931 Act, it then becomes unassailable. And where a statute is capable of two constructions, one of which renders it invalid as contravening the constitution, and the other sustains its validity, the construction in favor of its validity should be adopted. This is true without regard to the departmental construction that may have been placed upon such law, if such construction render it invalid.

This construction of this section of the statute makes it unnecessary for us to discuss the contention of the Attorney General on behalf of the Railroad Commission that one of the appellants, a common carrier motor carrier, whose rights are derived from the Act, cannot, while claiming the benefits of the Act, attack its constitutionality. Such a general rule is now well settled. But if it be conceded that Sec. 6(d) is unconstitutional, the appellant named would not come within such rule. All the benefits accruing to this named appellant are derived from other valid provisions of the Act. It received none nor claimed any,

under Sec. 6(d). And this Section of the Act, added to the House Bill by amendment thereto in the Senate, expressly provides that if such Section be declared invalid the legislature would have enacted all other provisions of the Act anyway. And if Hunter's rights are grounded entirely upon a distinct and separate invalid section of the Act, and those of another carrier derived entirely from other valid provisions of said Act, with whom Hunter's operations injuriously compete; manifestly such other legally authorized carrier is not estopped to assert the invalidity of that portion of such Act under which he claims no rights and enjoys no benefits.

■ The question of whether or not appellants showed themselves to be such interested parties within the terms of the statute as to entitle them to bring this suit need not be discussed at length. It was, we think, effectually disposed of in favor of the right of competing carriers to do so, in Railroad Commission v. Red Arrow Freight Lines, Tex.Civ.App., 96 S.W.2d 735, 739, writ refused, to which we refer without further discussion here.

It follows, therefore, that the Railroad Commission did not take into consideration, in granting Hunter's permit, the matters above outlined which the statute itself makes it their mandatory duty to determine. The appellants, protestants of Hunter's application before the Railroad Commission were entitled to require a compliance by Hunter with the law in his application for such permit; and to present proof on the matters covered by the statute. Granting of such permit without compliance with the applicable provisions of the statute renders the permit invalid, under the agreed facts.

The permit attacked is therefore set aside as invalid, the judgment of the trial court is reversed and the cause remanded for such ancillary relief as may be appropriate.

Reversed and remanded.