J. N. (NAT) HUDGINS v. STATE.

No. A-10081.   Jan. 13, 1943.
(133 P. 2d 231.)

Wendell G. Stockton, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Fred Hansen, Asst. Atty. Gen., for defendant in error.

JONES, P. J.  This appeal is from a conviction in the court of common pleas of Oklahoma county wherein the defendant, J. N. Hudgins, was charged by information with the crime of "operating a motor vehicle upon the public highway for transportation of passengers for compensation without a permit from the Corporation Commission." A jury was waived and upon a trial to the court the defendant was found guilty and a fine of $10 and costs assessed against him.

This case involves the application and interpretation of our law regulating motor carriers as set forth in Title 47, chapter 7, O. S. 1941. We have heretofore decided four cases involving so-called "travel bureaus." Herring v. State, 60 Okla. Cr. 449, 64 P. 2d 921; Herring v. State, 68 Okla. Cr. 32, 95 P. 2d 128; Hall v. State, 68 Okla. Cr. 367, 99 P. 2d 163; Hall et al. v. State, 68 Okla. Cr. 451, 99 P. 2d 166.

While there is a great similarity in the method of operation of the business of the defendant with those travel bureaus involved in the above cases, the defendant herein very ingeniously adopted what he refers to as the rent-lease method of operation. Under the operation of the travel bureaus, as disclosed by the cases above cited, persons traveling across the country would stop at the

travel bureau and register their car for the purpose of securing pay passengers who were traveling on the same route. Persons desiring transportation to some fixed destination along the route to be traveled by the car owner would go to the travel bureau and pay a definite amount, usually one cent a mile, to travel as a passenger in the automobile which had been registered. The owner of the automobile would pay to the operator of the travel bureau a certain percentage of the money paid by the passengers as his commission or fee for securing the passengers.

Under the plan devised by defendant the cross-country traveler who had possession of an automobile would stop at defendant's office and execute to the Travelers Benevolent Association operated by defendant a so-called lease contract and affidavit which, by its terms, provides:

"Travelers Benevolent Association
"Tel: 3-1229  21 S. Robinson
"Oklahoma City, Oklahoma
"Lease Contract and Affidavit No. ........
"State of Oklahoma
"County of Oklahoma, ss.

"I, the undersigned, hereinafter referred to as first party, and affiant, of lawful age, being first duly sworn, deposes and says, as follows: This contract, made and entered into on the date below set forth, by and between, the undersigned first party, and affiant, and the Travelers Benevolent Association, A Corporation, of the second part, and the affidavit as herein set forth by affiant-first party, witnesseth:

"That said first party has this day rented and leased to said second party a certain automobile, more fully described below, and it is agreed and understood by the said second party that this is a rental contract only, and not of sale, conditional or otherwise; that the renter has rented the automobile, described below, upon the express condition that it shall always remain the property of the party of the first part, and it is further expressly agreed and understood that the second party shall not permit

said automobile to be operated by one under the influence of narcotics, or liquor, or by one under 18 years of age, or by anyone for any illegal purpose, but said second party shall not be liable in any event.

"Notice: It is further agreed and understood that the sole relationship between the parties hereto is that of bailor-bailee, and said parties are not, and shall not be considered the agents, servants or employees of each other, in any capacity, and the second party may and is hereby authorized to bail, to lease or sub-lease said automobile, and the first party hereby confirms and ratifies said authority; it is further agreed and understood that the first party may, subject to such appointment or designation, by any subsequent bailee or lessee of said car, act as caretaker or driver of said car, however, subject wholly to the approval of such bailee or bailees.

"Notice: I, the undersigned bailor, further state, on oath, that I do and have applied to said second party, as a member of the Travelers Benevolent Association, to lease the car, described below, and respectfully state that I am in need of the assistance of the Association, and cannot, otherwise, attain my destination.

"That in consideration of One dollar and other good and valuable consideration, the receipt of which is hereby acknowledged, I do hereby lease unto the second party the automobile, described below, for a period of................ days, or................months. Dated this........day of................, 194.....

"Make & Model............................

"Tag No.----------------------------------

"Drivers License No................       ----------------------------------------
----------------------------------------       Bailor & Affiant

"Subscribed and sworn to before me this ............day of................, 194.....

"My Commission Expires: November 1, 1944.

                               ------------------------------------------------
                                     A Notary Public
                               "Travelers Benevolent Association
                                 "By----------------------------------------
                                   "Bailee & Attorney-in-fact."

When enough people had applied to the defendant for transportation on the route to be traveled by the leased automobile, the defendant in turn would have them execute what is denominated a rental contract and affidavit which, by its terms, provides:

"Travelers Benevolent Association
"Tel: 3-1229    21 S. Robinson
"Oklahoma City, Oklahoma

"Rental Contract and Affidavit No.........

"State of Oklahoma
"County of Oklahoma, ss.

"We, the undersigned, of lawful age, being first duly sworn, depose and say, as follows: This contract, made and executed on the date, below set forth, by and between the Travelers Benevolent Association, a corporation, first party, and the undersigned renters as parties of the second part and affiants, and the affidavit as herein set forth by affiants, witnesseth:

"That said first party has this day rented and leased to said second parties, jointly and severally, a certain automobile, below described, and it is agreed and understood by said second parties that this is a rental contract only, and not of sale, conditional or otherwise, and that said renters have rented the automobile, described below, upon the express condition that it shall always remain the property of the party of the first part, or its lessor, and that renters shall pay when due their proportionate part of the costs of the rental charge, including all damage, wear and tear excepted, and will return same to first party, or to such person, hereinafter designated as caretaker, upon the expiration of this lease-contract and/or bailment, and said second parties agree that they will not permit said automobile to be operated by one under the influence of narcotics, or liquor, or by one who is not 18 years of age, or more, or by anyone for any illegal purpose. It is further agreed and understood, and the undersigned second parties, and affiants state that the sole relationship between the parties hereto is that of bailor-

bailee, or lessor-lessees, and that said second parties shall not for any purpose be considered the agents, servants or employees of the first party in any capacity, and said first party shall not be liable for damages to any of said second parties in any event.

"Notice: We, the undersigned affiants, and second parties, upon oath, state that we, jointly and severally, undertake the lease of said automobile, as bailees, and we, jointly and severally undertake such trip, adventure, or travel as is made under this lease or bailment, and we do, jointly and severally, designate................, one of the undersigned bailees, as caretaker and driver of the car during the duration of this lease. We, the undersigned bailees, further state on oath, that we do and have applied to said first party, as member of the Travelers Benevolent Association, for the above lease, and respectfully state that we need the assistance of the said Association, and are otherwise without resources to attain our destination.

"Notice: We, the undersigned bailees, acknowledge that we have inspected the car, described below, and that we have, by our acceptance, approved the mechanical condition of the car. Dated this............day of........................, 194..... This lease shall expire after:............days, ............ months.

"Model & Make...........................    ....................................................
"Tag No.................................    ....................................................
"Drivers License No..............    ....................................................
.............................................    ....................................................
         "Address                      ....................................................
                                          Bailees & Affiants

"Subscribed and sworn to before me this...............day of..........................., 194......

"My Commission Expires: ...............................

..............................., Notary
"Travelers Benevolent Association
"By...............................................
"Bailor & Attorney-in-fact."

It is insisted by defendant that by reason of the execution of these contracts, a bailment is created, and that as the relationship of bailor-bailee then exists between himself and the passenger, he cannot be classified as a motor carrier or as one who aids, abets or assists a motor carrier in the transportation of passengers for hire under the motor carrier law, citing 15 O. S. 1941, § 531; Fullgraf, Adm'x, v. Oklahoma Ry. Co., 188 Okla. 592, 111 P. 2d 1072; Roeske v. Lamb et al., 39 N.M. 111, 41 P. 2d 522; State v. Dabney, 176 Ark. 1071, 5 S. W. 2d 304; Armstrong v. Denver Saunders System Co. et al., 84 Colo. 138, 268 P. 976; State v. Hertz Driv-Ur-Self Stations, Inc., 149 Wash. 479, 271 P. 331.

Without relating the facts in each of the cases relied upon by the defendant above set forth, it is sufficient to state that there is no question in the court's mind but that any person has a right to rent an automobile to transport themselves to such destination as they choose, and that the state is without power to forbid the carrying of one or more persons as a special undertaking or similar transaction on a 'share expense basis or for hire by an owner or driver of a motor vehicle.

47 O. S. 1941 § 161, which was the statute in effect at the time complained of herein, provides:

"(a) The term 'motor vehicle' when used in this Act shall mean any automobile, truck, truck-tractor, trailer or semi-trailer or any motor bus or any self-propelled vehicle not operated or driven upon fixed rails or tracks.

"(b) The term 'motor carrier,' when used in this Act, means any person, firm, business, trust or corporation, lessee or trustee or receiver, operating any motor vehicle upon any public highway for the transportation of passengers or property for compensation or for commercial purposes, doing an intercity business and not operating exclusively within the limits of an incorporated city or

towns within this state, and, for the purposes of this act, motor carriers shall be divided into three classes as follows:

"(1) Class 'A' motor carriers shall include all motor carriers operating as common carriers, of persons or property between fixed termini or over a regular route, even though there be periodic or irregular departures from said termini or route; and

"(2) Class 'B' motor carriers shall include all other motor carriers not operating as Class 'A' or 'C' motor carriers, whether as private carriers for hire or common carriers for hire, of persons or property; and

"(3) Class 'C' motor carriers shall include all other persons, firms or corporations, their trustees or receivers, engaged in the transportation of property in furtherance of any private commercial enterprise and not operating as a private carrier for hire or as a common carrier for hire, * * *."

In determining whether the business of the defendant herein comes within the terms of the definition of a Class "B" motor carrier under the above statute, it is necessary to review the evidence as disclosed by the record to determine the practical operation of defendant's plan. It should be borne in mind that courts never subordinate substance to shadow, and if the evidence discloses that defendant's plan is a subterfuge to avoid regulation of his business by the state, when the practical method of operation by defendant shows that his business is such! as may be regulated by the state and, as is defined by the statute above quoted as interpreted in the former decisions of this court, then the conviction herein should be sustained.

J. W. Marshall testified that he had been hired to go to the place of business of defendant and purchase a ticket to Albuquerque, N. M. That he was working for Mr. Anderson, an agent for the Union Bus Station. That

he went to the Rasbach Hotel where defendant maintained his office and asked defendant what it would cost to go to Albuquerque and defendant told him $6. That he said he wanted to go and defendant handed him a card and said "You sign this card," and "I signed it."

"Q. (By Mr. Daugherty, Asst. County Attorney): Then what happened after that? A. Well, this driver came in and he said, after a while—he said, 'You—I am ready to go'. Q. Did you go with the driver? A. Yes, sir. Q. What kind of automobile or conveyance did he have? A. It was a 1940 DeSoto sedan. Q. Was there anybody else that went with you? A. Yes, sir. Q. How many other people? A. Two more passengers. One colored fellow and an old white gentleman. Q. Did you know anything about the arrangements that were made with Mr. Hudgins for that transportation? A. No, sir. I did not. Q. Now, did you notice the license tag on the car? A. Yes, I did. Q. Did it have the word 'Bus' written down the center or there between the numerals? A. No, sir. Q. Was it an Oklahoma tag? A. No, sir. Q. What kind of tag was it? A. Illinois."

The witness further testified that the parties traveling in the automobile were stopped at Yukon and brought back to the courthouse in Oklahoma City. On cross-examination the witness admitted that he used the alias "Jimmie Martin" in signing the card presented to him by defendant. When confronted with the so-called rental contract and affidavit the witness identified the name "Jimmie Martin" appearing thereon as having been signed by him. On redirect examination the witness testified that he and each of the other passengers paid their fare to Mr. Hudgins, the defendant, the exact amount paid by the other two passengers not being remembered by the witness.

S. D. Anderson testified that he was an investigator in the Department of Public Safety and that on November 23, 1940, he was investigating individuals who were

in the business of soliciting and obtaining passengers
for unlicensed motor carriers to be hauled over the high-
ways of Oklahoma for hire. That he made an investiga-
tion of the place of business of the Travelers Benevolent
Association operated by defendant in the Rasbach Hotel.
That he had been watching the operations of the defend-
ant for about a month prior to November 23, 1940. That
there was a sign on the hotel window which read "Travel
Information" or "Travel Bureau" in large letters which
could be seen across the street from the hotel. That he
arrested the witness Marshall, the driver of the automo-
bile and the other passengers at Yukon and brought them
back to Oklahoma City, where he also arrested the de-
fendant. That in a conversation had with defendant and
the driver Stone at the courthouse the defendant explained
that he had an association and coupons for the passengers
to sign which made it unnecessary for him to secure a
permit from the Corporation Commission to operate his
business. That the defendant further stated in the con-
versation that he was given part of the money which the
passengers paid to Stone. That the other two passengers
besides Marshall were going to California. That defend-
ant and Stone each stated that they did not have a permit
from the Corporation Commission, and that there was no
insurance on the automobile to guarantee the safe arrival
of the passengers at their destination.

The defendant testified in his own behalf that as sec-
retary of the Travelers Benevolent Association he had
been operating the association since October 25, 1940.
That he leased cars from the owners and in turn rented
them to individuals who did not have the money to pay
regular bus fare and no other means of reaching their
destination. On direct examination he testified:

"Q. What if people come in and want to go to California? Do you lease them a car to go there? A. If I have a car I have leased I rent them that car jointly with someone else. Q. And do they have full control, as far as the operation of the automobile is concerned, during the trip? A. Just as much as anyone else. Q. How long are these leases taken for? A. Over the period of time it takes to ride to their particular destination."

He further identified the contracts signed by Stone and the passengers in Stone's automobile which are worded exactly as the two contracts hereinabove set forth. That the passengers, Browder, Booker and Marshall, paid him $10, $12, and $6, respectively, as a consideration for their trip. That of this money he gave $22 to Stone, the driver of the automobile, and retained $6, of which $3 was for money which he had previously advanced to Stone and $3 for his commission or fee. On cross-examination defendant admitted that the passengers paid Stone directly the $22 and to him $6. That Stone was driving an automobile which belonged to a finance company in California. That the owner of the car had defaulted in his payments and Stone had been sent by the finance company to return the car to California. That Stone came to defendant and wanted some passengers that would help pay him some money for his trip out here. That for the $22 which was paid to Stone the three passengers were entitled to ride in the car to their destination and Stone was to furnish the gas and oil and maintain the car out of the money which was paid to him. On redirect examination the defendant testified that he did not hold himself out as a carrier of passengers and that he had no sign and ran no advertisements to that effect, and that he had never been in what is known as the travel bureau business. On further cross-examination the defendant testified that if anyone came to his place of business and wanted to

go to any certain point that he could tell them the cost, which was one cent a mile. That if a person wanted to go to Houston, Tex., and he did not have a car going to that place he could not do business with them. On redirect examination the defendant stated that the sign in the window where he operated his business read "Travelers Benevolent Association" and "Cars Anywhere Most Anytime."

In Herring v. State, supra, 60 Okla. Cr. 449, 64 P. 2d 921, it is stated:

"Defendant who conducted a travel bureau, and who contracted with passengers for transportation to intrastate and interstate points, and fixed rates to be charged, the places where the passengers would take the conveyance, and the payment of fare, held guilty of operating a motor vehicle on public highway without a permit from the Corporation Commission, where neither defendant nor party transporting passengers had a permit for operation as a motor carrier, since party transporting passengers was a class B motor carrier, as defined by section 3700, Okla. St. 1931, as amended by Laws 1933, c. 156, § 1, 47 O. S. 1941 § 161.

"That part of the motor vehicle law, applicable to a class B motor carrier, section 3706 and sections 3700, 3704, 3711, Okla. St. 1931, as amended by sections 1, 2, 6, c. 156, S. L. 1933, 47 O. S. 1941 §§ 161, 165, 172, defining motor carriers, requiring a permit of carriers to operate on the highways, forbidding operation without permit, defining an offense, and providing punishment, is not unconstitutional.

"Freedom of contract, while the general rule, is nevertheless not absolute, but subject to a great variety of legitimate restraints, among which are such as are required for the safety and welfare of the state and its inhabitants; and when the exercise of that freedom conflicts with the power and duty of the state to safeguard its property

from injury and preserve it for those uses for which it was primarily designated, such freedom may be regulated and limited to the extent which reasonably may be necessary to carry the power and duty into effect.

"In the exercise of its power to regulate the use of its highways and to make them more safe and convenient for private vehicles and the public generally, the state may classify motor vehicles and make reasonable regulations governing the use of the state's highway. To that end it may require carriers for hire to procure a permit and to conform to such reasonable regulations as a condition precedent to the using the highways in the business of a carrier."

In the body of the opinion it is stated:

"We are satisfied the state is without power to forbid or to make criminal the act of carrying of one or more persons as a special undertaking or single transaction, on a share expense basis or for hire by an owner or driver of a motor vehicle. That is to say, if an owner or driver of a motor vehicle shall desire to drive to another point within or beyond the boundaries of the state and for such trip shall make arrangements to take other persons with him on a share expense basis or for a fixed charge, his act would not be unlawful for such purpose. But where the undertaking is a business or part of a business or where he proposes to carry all persons indifferently who choose to employ him, he becomes a carrier within the terms of the statute. In such case he is engaged in a business which the state may regulate and control.

"In these modern days, the congestion of traffic of the highways, the enormous number of accidents with the great toll of death and injuries make restrictive regulation of the use of the highways imperative and has tended to make more liberal the decisions of the courts in upholding state legislation on the subject."

In support of the conclusions reached in said opinion the decision of the United States Supreme Court in the case of Stephenson et al. v. Binford et al., 287 U. S. 251,

53 S. Ct. 181, 187, 77 L. Ed. 288, 87 A.L.R. 721, was cited. That learned court, in its opinion, stated:

"The requirement of the Texas statute under attack that contract carriers must have a permit with the prerequisites in the statute for such a permit, is reasonable, particularly in that this method enables the State to know who will use its highways and to more efficiently regulate such use. The permit system has immediate relation to the condition of the roads and bridges, congestion of the highways and the character of equipment to be used, which relates not only to the effect of the operations on business but also to the problem of safety and convenience in use of the highway."

If the operations of the defendant, as hereinabove stated, had been a single transaction in accordance with the terms of the written contract, he and Stone would not be guilty under the statute. Here, however, the defendant has an established business which earns sufficient fees to pay office expense and, according to defendant's testimony, he was to be paid $100 per month out of the fees earned by said association. Under the defendant's own testimony the association operated by him proposed to carry all persons indifferently who made application to them for that purpose. The association of defendant was organized under the purported authority of section 9943, O. S. 1931, 18 O. S. 1941 § 581, which provides:

"The following associations for benevolent and charitable purposes may become incorporated, as provided in this Article, to-wit: * * *

"2. For the mutual assistance of the members in time of sickness or necessity, and to provide a fund for this purpose by contributions of the members thereof from time to time, and for the like incidental benevolent purposes."

It might be well to note that the business of the association as described by defendant does not come with-

in the purview of the above section of the statute as the members referred to in said statute could hardly include travelers who would meet other travelers in an office such as we have in this case and travel to various parts of the United States with no apparent intention of returning to the place of business from which they started. Although the corporation, in support of its pretense, provides for the collection of an annual membership fee, the testimony shows that no fees were ever in fact collected except the fee which was paid as compensation for the trip which was to be taken by the traveler. It was never contemplated that the purported member would ever be an active member of the association or ever return to Oklahoma City. It is apparent to this court that while the plan of operation has been ingeniously devised, it is a pretense only, while the actual method of operation is substantially the same as that of the so-called travel bureaus.

Courts are not bound by the designation which a party may give to his method of operation. The defendant may designate his plan as the rent-lease plan or the bailor-bailee plan, but it is incumbent upon the courts to look behind the pretense, if there is pretense, to determine whether a party is attempting to do indirectly that which he is prohibited by statute from doing directly. If this court should hold that by the adoption of a dual lease and rental plan, such as is involved here, a person may avoid the restrictions imposed by our motor carrier act, and which is sustained by sound public policy, then the various admitted motor carriers could accomplish the same result by having their passengers, before entering their buses at the various places on their fixed route, sign a rental contract and membership card such as was done herein and thus avoid regulation of their business

by the state. It may not be done under our law in either instance.

The defendant further complains of the action of the court in allowing the witness Marshall to testify concerning what was said and done by himself and the defendant as the same was an attempt by Marshall to vary the terms of a written contract which he had executed. In disposing of this question it is sufficient to state that the evidence objected to was all admitted before there was any proof before the court that any written instruments had been executed. Furthermore, a court should not refuse to admit parol testimony in a criminal action to explain certain acts which were done by defendant which amount to a crime because the defendant had contrived to have the witness sign a written instrument which would cover up his crime. However, in this case, we find the alleged error, if any, was cured by reason of the fact that the defendant, as a witness in his own behalf, upon questioning by his counsel, related all of the facts and circumstances surrounding the transaction with the witness Marshall. It should be further noted that this cause was tried to the court. In such cases the court will give effect and weight only to that testimony which is legally admissible in evidence and will disregard incompetent and inadmissible evidence which may be introduced.

The judgment of the court of common pleas of Oklahoma county is affirmed.

BAREFOOT and DOYLE, JJ., concur.