**RAILROAD COMMISSION OF TEXAS et al., Appellants,**

v.

**CENTRAL FREIGHT LINES, INC., et al., Appellees.**

**No. 11637.**

Court of Civil Appeals of Texas.

Austin.

Nov. 27, 1968.

Rehearing Denied Dec. 18, 1968.

Crawford C. Martin, Atty. Gen., Nola White, First Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., James H. Cowden and Thomas F. Sedberry, Asst. Attys. Gen., Lanham & Hatchell, Austin L. Hatchell, Austin, for appellants.

Reagan Sayers, Clayte Binion, Rawlings, Sayers & Scurlock, Fort Worth; Phillip Robinson, James M. Doherty, James, Robinson, Felts & Starnes, Austin, for appellees.

HUGHES, Justice.

This suit was brought by Central Freight Lines, Inc., Red Arrow Freight Lines, Inc. and Merchants Fast Motor Lines, Inc., appellees, seeking invalidation of certain orders of the Railroad Commission of Texas granting V. C. Bilbo Common Carrier Motor Carrier authority to provide services in competition with appellees. The trial court granted appellees the relief sought. The Commission and Bilbo have appealed.

On September 30, 1964, V. C. Bilbo filed an application with the Railroad Commission seeking to amend Limited Common Carrier Certificate No. 3039 so as to authorize the transportation of additional commodities over various routes as follows:

BUILDING MATERIALS, GYPSUM (EXCEPT IN BULK), GYPSUM PRODUCTS AND MATERIALS AND SUPPLIES used in the manufacture and/or distribution thereof, over the following highways:

"United States Highways (Here follows thirty six numbers)

State Highways (Here follows one hundred and sixty one numbers), serving all intermediate points along said highways."

On February 25, 1965 the Commission issued its Order granting such application and authorizing Bilbo to transport:

"Building Materials, limited to those that are closely related to gypsum (except in bulk), gypsum products and materials and supplies used in the manufacture and/or distribution thereof"

over the same highways listed in the application. On March 17, 1965, appellees filed exceptions to the Order, and on July 16, 1965, the Commission issued another Order sustaining the exceptions in part and amending its previous Order of Febru-

ary 25, 1965, limiting the grant of authority to the following commodities:

"Gypsum (except in bulk), Gypsum products and Building materials and supplies when tendered as an integral part of the Gypsum products, from the plant or warehouse of Flintkote Company at Sweetwater and Enis; from the plant or warehouse of Bestwall Gypsum Company at Acme and Houston; and from the plant or warehouse of Celotex Corporation approximately five (5) miles west of Hamlin, Texas, over the same highways set forth in the Order of February 25th."

Findings of fact and conclusions of law were made and filed by the trial court at the request of appellants, but additional findings and conclusions requested by appellees were overruled.

Appellants' First Point is that the trial court erred in holding that the Orders of the Commission grant Bilbo a Common Carrier Certificate over irregular routes of a type and kind not authorized by Art. 911b, Vernon's Ann.Tex.Civ.St., and were, therefore, unauthorized by law.

Under the authority granted Bilbo, he proposes to operate on a call and demand basis on irregular schedules over any and all of the highways named in his Certificate in order to provide service from point of origin to destination.

The evidence shows that it has been the practice of the Commission for many years to grant limited Common Carrier Certificates authorizing the transportation of limited classes of commodities over regular routes, and that the Commission has construed 911b consistently to authorize the granting of Common Carrier Certificates (as opposed to specialized motor carrier certificates) over regular routes only.[1]

The basic position of appellants is that Art. 911b does not require the Commission to restrict the granting of Common Carrier Certificates to regular routes only, but if so, the Certificate and Orders issued Bilbo describe regular routes over which the proposed operations must be conducted.

We believe that it would be helpful to an understanding of our decision to consider, briefly, the legislative history of the regulation of motor carriers for hire over our highways.[2]

The first effort of the Texas Legislature at such regulation was by enacting Chapter 314, Acts Regular Session, 41st Legislature, 1929, which became effective June 13, 1929. In the 1929 Act motor carriers were classified as either Class "A" or

---

1. The Attorney General, through Assistant Attorney General (Judge) Glenn R. Lewis, August 26, 1940, issued a ruling to the Commission that it could not issue a Certificate authorizing the carrying of commodities generally and serving the public generally over irregular routes. After referring to Secs. 10 and 11 of Art. 911b, the opinion states:

   "In our opinion the requirement that the application describe the route or routes over which the applicant desire(s) to operate may not be dispensed with. Unless such be done it would be impossible to determine whether existing services are sufficient, whether there is any need of the new service. Without the route is fixed in the application no one could tell who are the existing transportation facilities serving such territory to whom notice must be given. Without such description of the route in the application for an or-

der granting the certificate a court could hardly tell who would be an interested party entitled to prosecute an appeal, unless it should hold all carriers in Texas to be such.

   In Railroad Commission [of Texas] v. Red Arrow Freight Lines, [Tex.Civ. App.], 96 S.W. [2d] 735, by the Austin Court of Civil Appeals, it was held that a new common carrier motor carrier service cannot be granted except upon a showing and commission finding of convenience and necessity. Manifestly there can be no such showing and finding unless the route is definitely identified, so as to permit inquiry on the issue of convenience and necessity as applied to that particular route."

2. The legislative history of the Motor Carrier Law is detailed by the Supreme Court in Alamo Express, Inc. v. Railroad Commission [Tex.], 407 S.W.2d 479.

Class "B" carriers, and in Section 1(b) of the Act, Class "A" carriers were specifically defined as carriers engaged in transporting property for hire " * * * over fixed routes, under regular schedules and having fixed termini * * * " In the same section of the Act, Class "B" carriers were defined as carriers transporting property for hire having " * * * no fixed routes, regular schedules or fixed termini * * * " Class "A" carriers were to receive "certificates of convenience and necessity," while Class "B" carriers were to receive "permits."

Section 10 of the 1929 Act required that an applicant for a Class "A" certificate file an application defining the routes over which operations were proposed and setting forth the applicant's operating schedules, while Section 6 prescribed the type of application which the Class "B" motor carrier applicants were required to file. The provisions of the 1929 Act relating to public hearing required that such hearings be held with respect to applications for certificates of convenience and necessity, and since only Class "A" carriers were recipients of such certificates (as distinguished from the "permits" issued to Class "B" carriers), the Railroad Commission construed the Act to mean that no hearing or proof of public convenience and necessity was necessary in approving applications for Class "B" permits.

The 1929 Act was amended by the 42nd Legislature in 1931. See Chapter 277, Acts of Regular Session of the 42nd Legislature in 1931. The 1931 Act, which was and is codified as Art. 911b, V.T.C.S., did not define common carrier motor carriers specifically but did define a contract carrier as any motor carrier other than a common carrier. Section 3 of the Act provided that no motor carrier shall operate as a common carrier without first having obtained a "certificate of con-

venience and necessity" pursuant to a finding to the effect that the public convenience and necessity require such operation, and that no motor carrier shall operate as a contract carrier without first having obtained from the Commission a "permit" so to do in accordance with other provisions of the Act. Section 10 of the 1929 Act was carried forward word-for-word into Section 10 of Art. 911b which today prescribes the requisites of a common carrier application.

The "grandfather" clause of the 1931 Act appears in Section 5 of Art. 911b and provides in pertinent part as follows:

" * * * the Commission shall, without application or hearing when this Act goes into effect, issue all motor carriers then operating lawfully under permanent certificates [f. n. [3]] of public convenience and necessity heretofore issued to them, certificates in lieu of the certificates issued under the terms of the former law covering the same routes that said common carrier shall have been operating over, and no more."

The "grandfather" clause thus provided for the issuance of common carrier motor carrier certificates only to those carriers operating over fixed regular operating routes, to wit, the so-called Class "A" carriers under the 1929 Act.

Section 6(d) of the 1931 Act, commonly referred to as the "Special Commodity" provision, authorized the Railroad Commission to issue "special permits" to those carriers desiring to engage in the business of transporting for hire over the highways livestock, mohair, wool, milk, livestock feed stuffs, household goods, oilfield equipment, timber when in its natural state, farm machinery and grain. Section 6(a) required the Commission to determine immediately the application of any Class "B" motor carrier filing an application under

3. Under the 1929 Act, only Class "A" carriers were issued "certificates." Class "B" carriers were issued "permits."

the 1931 Act, and pending the determination of the applications, such carriers were required to operate in accordance with the rules, rates and regulations of the Commission.

Recipients of the so-called "special commodity permits" under Section 6(d) of the 1931 Act were the successors-in-interest to the irregular route Class "B" motor carriers defined in the 1929 Act. The Railroad Commission construed the provisions of the 1931 Act to authorize the issuance of special commodity permits, upon hearing, without proof of public convenience and necessity. In March, 1940, however, in Texas & Pacific Ry. Co. v. Railroad Commission and Hunter, Tex.Civ.App., 138 S.W.2d 927, reversed and dismissed because mooted by the 1941 Act, 138 Tex. 148, 157 S.W.2d 622 (1941), the Court of Civil Appeals (Austin) held that the Railroad Commission's action in granting special commodity permits was arbitrary and unreasonable and that such permits were void because the Commission did not require proof of public convenience and necessity where the applicant proposed to serve the public generally.

As a result of the decision in Hunter invalidating the special commodity permits under which specialized irregular route carriers were operating, such carriers sought legislation to set up a class of common carriers for the transportation of special commodities. In 1941, the 47th Legislature at its Regular Session amended Section 6(d) of the 1931 Act so as to establish a class of common carriers to be known as "Specialized Motor Carriers." The special commodity permit holders who had been operating under the 1931 Act were given so-called "grandfather clause certificates" under the 1941 Act authorizing and granting to such special commodity permit holders "Specialized Motor Carrier Certificates" including all the irregular route, irregular schedule operating authority theretofore granted under the said special commodity permits which had been held void in the Hunter case. The 1941 Act included a

"Declaration of Policy" reading in pertinent part as follows:

"It is hereby declared to be the policy of the Legislature to create a class of common carrier motor carriers designated as 'specialized motor carriers' to engage in the business of transporting for compensation or hire over the highways in this State over irregular routes on irregular schedules * * * "

Thus, the present provisions in Art. 911b, V.A.C.S., authorizing the granting of irregular route authority to specialized motor carriers may be traced back to the Class "B" motor carrier provisions in the 1929 Act, and present provisions authorizing the granting of all other common carrier motor carrier certificates may be likewise traced directly back to the Class "A" motor carrier provisions of the 1929 Act which specifically limited the granting of Class "A" certificates to carriers proposing to operate over fixed regular routes between fixed termini.

Sec. 1(i) of Art. 911b, defines "Specialized motor carrier," in part, as follows:

"(i) 'Specialized motor carrier' means any person owning, controlling, managing, operating, or causing to be operated any motor-propelled vehicle used in transporting, over any public highway in this state, over irregular routes on irregular schedules, for compensation and for the general public with specialized equipment, property requiring specialized equipment in the transportation and handling thereof;"

Sec. 5a of Art. 911b(c) prescribes the requisites of an application for a Certificate to operate as a specialized motor carrier among which are:

"2. The commodity or commodities or class or classes of commodities which the applicant proposes to transport and the specific territory or points to, or from, or between which the applicant desires to operate, together with the description of

each vehicle which the applicant intends to use.

3. It shall be accompanied by a map, showing the territory within which, or the points to or from or between which, the applicant desires to operate, and shall contain a list of any existing transportation company or companies serving such territory, and shall point out the inadequacy of existing transportation facilities or service, and shall specify wherein additional facilities or service are required and would be secured by the granting of said application."

It should be noted that neither of these sections contains the word "route." The emphasis here is upon "territory," whereas, in Sec. 10, infra, relating to common carrier motor carriers other than specialized common carrier motor carriers the emphasis is upon "route or routes."

In Alamo Express, Inc. v. Railroad Commission, 407 S.W.2d 479, Tex.Sup.Court (1966) the Court recognized that the Legislature had provided for two classes of common carrier motor carriers, a feature of one being that it operated over regular routes and a feature of the other being that it operated over irregular routes. We copy from that opinion:

"In 1941 the Legislature enacted the Specialized Motor Carrier Act. Acts 47th Leg.Reg.Sess., Ch. 442, p. 713. The purpose of the Act was to create and regulate the holders of and applicants for permits and certificates as specialized motor carriers as a new class of common carrier. The 1941 Act made substantial changes in and additions to the regulation of irregular routes carriers of commodities which required special equipment. The Act contained seven sections, all of which related to special commodity carriers. Section 1 declared that the policy of the Act was 'to create a class of common carrier motor carriers designated as "specialized motor carriers." ' Section 7 of the Act said that an emergency existed

because carriers of special commodities were not regulated according to the needs of the general public. In other words, the purpose of the 1941 Act was to make provisions for the regulation of special commodity carriers. The provisions for issuance of certificates to the new class appear in Section 5a, Article 911b, V.T. C.S. Procedures for applicants for certificates as regular route common carriers, found in Sections 8 through 12, Article 911b, were undisturbed and unrepealed. We see, therefore, that the procedures for the regulation of the two classes of common carriers have different legislative origins and are contained in separate sections of the Motor Carrier Act. Procedures respecting the two classes of carriers are and always have been different in many ways.

The protesting carriers' argument is that the phrase 'or any other common carrier' contained in Sections 5a(c) and 5a(d) extends the more stringent requirement as to findings to regular route common carriers. Such a construction would require an implied repeal of Section 10 of the Motor Carrier Act, and would leave the procedure for applications and hearings for regular route common carriers in confusion."

The Bilbo application was not filed as a specialized motor carrier application. The commodities sought to be transported are not named in Sec. 5(a) of the Act. It was not an application for authority as a specialized motor carrier.

The contents of an application for a certificate of authority to operate as a common carrier motor carrier as distinguished from a specialized motor carrier are specified in Sec. 10 of Art. 911b. We copy the following therefrom:

"(2) The complete route or routes over which the applicant desires to operate, together with the description of each vehicle which the applicant intends to use.

(3) A proposed schedule of service and a schedule of rates to be charged between the several points or localities to be served.

(4) It shall be accompanied by a plat or map showing the route or routes over which the applicant desires to operate, on which plat or maps shall be delineated the line or lines of any existing transportation company or companies serving such territory, and shall point out the inadequacy of existing transportation facilities or service, and shall specify wherein additional facilities or service are required and would be secured by the granting of said application."

We do not believe the Certificate issued Bilbo is in substantial compliance with the requirements of Sec. 10, Art. 911b. If it is, then there is no distinction between service over "irregular routes" by specialized common carrier motor carriers and service over "regular routes" by common carrier motor carriers.

In Falwell Fast Freight, Inc.—Purchase —Draper, 40 M.C.C. 439 (Interstate Commerce Commission, 1946) it is stated that " * * * The essential feature of any regular route operations is that it shall be between fixed termini and over a regular route."

■ In the Bilbo Certificate there are no fixed termini designated and no regular routes specified for service between fixed termini. Instead, the named highways to be used in performing the transportation services authorized are left purely to the discretion of Bilbo. We do not question the authority of the Commission to designate more than one route for service between fixed termini, but such designations should be plain and specific.

Appellants lay great stress upon the decision in Red Arrow Delivery Service v. Greyhound Corporation, 377 S.W.2d 596 (1964), Ky. Court of Appeals. The question there was whether a certificate issued

was in compliance with Kentucky law which restricted common carrier certificates to persons engaged in transportation over "regular routes," and whether this term embraced regular service as well. We quote from the opinion of the Court:

"Admittedly, each of the 25 routes covered by the certificate granted to Red Arrow is a 'regular route' from the standpoint of geography, in that it has a fixed course and fixed termini.

\* \* \* \* \* \*

In our opinion, the significant feature of regular route service is that the carrier holds out to the public that he will transport between fixed points, promptly, such goods as are tendered to him for transportation.

\* \* \* \* \* \*

The fact that the Red Arrow certificate covers 25 routes, which in practicality permits operations to almost every point in the Lexington trading area, does not require the conclusion that an irregular route operation has been authorized. We do not conceive how the adding together of 25 separate regular routes changes their character as regular routes."

We do not question the soundness of these statements of the law. To us, they seem to condemn the form of the certificate issued to Bilbo.

We will notice some of the arguments advanced by Bilbo. We quote from his brief:

"An examination of an official Texas highway map reveals hundreds of county roads, farm-to-market roads, and loops and spurs which an irregular route carrier may use at its discretion. Official information released by the Highway Department, of which this Court may take judicial notice, reveals that there is a total mileage in Texas of U. S., State and Farm to Market road of 65,085.68 miles. The total mileage for U. S. and State

Highways only is 28,253.72. The total Farm to Market Road mileage is 36,831.-96, and the County road mileage is 137,-597.26. By simple addition we find that there is a total road mileage in the State of Texas of 202,682.94 miles. The Commission in its order has authorized Bilbo to operate on only 28,253.72 miles. This in itself would prevent the order and certificate herein from being over 'irregular routes.' "

■ Appellants do not amplify this conclusion and we are unable to rationalize it. It does not follow, we believe, that because the authority granted Bilbo did not include all Texas roads, it specified "regular routes" as a matter of law.

We quote further from appellants' brief:

"Section 10 is the only Section of the Act containing specific requirements as to the route or routes over which operations shall be conducted. Nowhere in the Article is the Commission required to issue a common carrier certificate restricted to specific routes or highways. The above requirement must be set forth in the application to invoke the Commission's jurisdiction, but it does not limit the Commission in granting applications covering route or routes which it deems justified by the evidence before the Commission. This clearly would include Bilbo's route designations.

Appellees relied upon two (2) Attorney General Opinions, No. 0-2608 and 0-1437. Neither opinion comments on what the Commission may do in granting an application after it has acquired jurisdiction of such application under the provisions of Section 10. They merely hold that an application must set forth the routes over which the applicant proposes to operate, but they do not hold that the Commission may not grant an application over which it has acquired jurisdiction on such terms and conditions as it may see fit."

■ Sec. 9 of Art. 911b prescribes the duties of the Commission in considering an application for a certificate of convenience and necessity and provides that when an application is granted the certificate shall be "issued upon such terms and conditions as said Commission may impose and subject to such rules and regulations as it has or may thereafter prescribe."

This language, in our judgment, must be read in context with all the other statutes on the subject. It does not give the Commission unbridled discretion to issue a certificate on any terms or conditions it pleases and without regard to the application for the certificate and the statutes and decisions respecting the contents of the application by which the privileges which may be awarded applicant must be measured.

All parties discuss specific certificates issued by the Commission in support of their respective positions. We have considered these Certificates and we do not find them to be wholly consistent in the support of the position taken by any party. They do demonstrate the complexity of the question with which we are dealing.

■ The trial court in his conclusions of law held that the application filed by Bilbo did not meet the requirements of Sec. 10 of Art. 911b, and that the Orders and Certificate issued to Bilbo purported to grant him a Common Carrier Certificate over irregular routes of a type and kind not authorized by the provisions of Art. 911b.

We agree with these conclusions. This holding requires an affirmance of the judgment of the trial court and dispenses with the necessity of determining appellants' Second Point relating to the question of substantial evidence to support the Orders and Certificate of the Commission granting Bilbo authority to originate traffic at Houston.

The judgment of the trial court is affirmed.

Affirmed.