**RAILROAD COMMISSION OF TEXAS et al., Appellants,**

v.

**UNITED PARCEL SERVICE, INC., Appellee.**

No. 13267.

Court of Civil Appeals of Texas, Austin.

April 8, 1981.

Rehearing Denied April 29, 1981.

---

B. D. St. Clair, McGinnis, Lochridge & Kilgore, Austin, and Jay W. Elston, Fulbright & Jaworski, Houston, for appellee.

R. Lambeth Townsend, Asst. Atty. Gen., Austin, for Railroad Commission of Texas.

Philip Robinson, Robinson, Felts, Meyers & Starnes, Austin, for Central Freight Lines, Inc., Red Arrow Freight Lines, Inc., and Valley Transit Co., Inc.

Charles E. Munson, Doherty, Birnbaum & Munson, Austin, for Kerrville Bus Co., Inc., Painter Bus Lines, Inc., Greyhound Lines, Inc., Arrow Coach Lines, Southwestern Transit Co., New Mexico Transp. Co., Texas, New Mexico and Oklahoma Coaches, Inc., Texas Motor Coaches, Inc. and Central Texas Bus Lines, Inc.

Robert J. Birnbaum, Austin, Ernest B. Ledford, Vice President, Abilene, for Merchants Fast Motor Lines, Inc.

Timothy S. Herman, Rogers, Hughes & Herman, Austin, for Morgan Express, Inc., Northern Tex-Pack Exp., Inc., Beaver Express, Inc., O & A Tex-Pack Exp., Inc., Liberty Tex-Pack Exp., Inc., Mistletoe Tex-Pack Exp., Inc., Western Tex-Pack, Inc. and Blue Bonnet Exp., Inc.

POWERS, Justice.

United Parcel Service, Inc., appellee, filed an application with the Texas Railroad Commission requesting a certificate of convenience and necessity authorizing appellee to conduct intrastate operations as a common carrier of a limited class of general commodities. Stated generally, the application proposed a statewide, small-package pickup and delivery service in the nature of a parcel post service. The Commission dismissed the application "for want of jurisdiction" and appellee obtained judicial review of the Commission's final order by suit in the 200th Judicial District Court of Travis County, Texas. Appellants are the Commission and twenty-four interested motor carriers, defendant and intervenors respectively in the trial court.

The trial court concluded that the Commission possessed jurisdiction. The court therefore set aside the Commission's order of dismissal and remanded the case to the agency to be considered on its merits. We affirm the judgment of the trial court.

Appellants bring to this Court several points of error which, taken together, attack the trial court's decision that the Commission had the requisite statutory power under Tex.Rev.Civ.Stat.Ann. art. 911b, to consider and determine appellee's application. That statute governs such applications and intrastate motor carrier operations generally. By other points of error they challenge certain "findings of fact" made by the trial court. These latter points of error refer to matters that the trial court "deemed" true for the purpose of its review of the agency's final order of dismissal. There was no evidentiary hearing in the agency or in the trial court.

Appellee proposed in its application a motor carrier service to be conducted on all the public roads of the state.[1] Briefly stated,

---

1. The application proposed a motor carrier service unusual in its statewide scope and in its orchestration of irregular and regular routes and schedules. By attachments, it listed and described as the routes intended to be used all Interstate Highways, U. S. Highways, State Highways, Farm to Market Roads, Ranch Roads, Loops, Park Roads and Recreational Roads in the state. The application stated that appellee proposed to use such other access roads, streets and by-ways as may be necessary to serve shippers and receivers of pack-

appellee proposed a service that would operate as follows. Certain of appellee's motor vehicles would leave at 9:00 A.M. each business day from appellee's "operating centers" located in various cities, for the purpose of picking up and delivering small packages. No times are specified in the application for such pickups and deliveries and the routes of travel are not fixed. Appellee states that it intends to have a vehicle appear each business day at the premises of each shipper desiring the service, without special call and regardless of where the shipper is situated or whether he has any packages to ship that particular day. The routes traveled by these vehicles would depend upon the location of such shippers and the location of the consignees of that day's packages. In addition, these vehicles would pickup and deliver packages on a call and demand basis. The vehicles employed on these pickup and delivery circuits would return to the "operating centers" each day at 5:00 P.M.

Other motor vehicles belonging to appellee would make regular trips transporting packages between appellee's "operating centers" and "hubs." The "hubs" and "operating centers" are transfer facilities located throughout the state where packages are collected, sorted and directed to their destinations. The vehicles making these trips will travel the same routes each time at uniform time intervals. Departure and arrival times for these trips are set out in a timetable. Appellee intends to orchestrate all of its intrastate operations so that deliveries will be made to Texas consignees within one or two business days.

Appellee presently operates an interstate motor carrier service in the manner described above; and its proposes to integrate the planned intrastate service and its existing interstate service.

Appellants describe the proposed intrastate service as being one to be conducted "over irregular routes and on irregular schedules." This refers to the daily pickup and delivery circuits described above. They argue that since 1931, when Art. 911b was first amended, only "contract carriers" and "specialized motor carriers" may lawfully operate "over irregular routes and on irregular schedules" and common carriers such as appellee are prohibited from doing so. They argue further that section 10 of Art. 911b forbids the Commission to "consider" any common carrier's application for a certificate of convenience and necessity unless the application shows, among other things, the "complete route or routes over which the applicant desires to operate" and the applicant's proposed "schedule of service." Citing a series of amendments to Art. 911b, appellants interpret the former phrase to mean a "regular" or "fixed" route or routes. The latter phrase they interpret to mean planned trips at "regular" or "fixed" intervals, as in a timetable of fixed arrival and departure times. The daily pickup and delivery circuits proposed by appellee are not fixed either as to routes or the times of pickup and delivery; hence appellants reason that the Commission properly dismissed the application because the agency was not permitted to "consider" such an application under section 10 of Art. 911b.[2]

ages situated off the designated routes. Specific arrival and departure times, and specific routes, were designated in tables attached to the application for that portion of the proposed operations intended to be conducted on regular routes and regular schedules.

2.   "Sec. 10. No application for a certificate of public convenience and necessity shall be considered by said Commission unless it be in writing and set forth the following facts:
. . . .
"(2) The complete route or routes over which the applicant desires to operate, together with the description of each vehicle which the applicant intends to use.

"(3) A proposed schedule of service and a schedule of rates to be charged between the several points or localities to be served.
"(4) It shall be accompanied by a plat or map showing the route or routes over which the applicant desires to operate, on which plat or maps shall be delineated the line or lines of any existing transportation company or companies serving such territory, and shall point out the inadequacy of existing transportation facilities or service, and shall specify wherein additional facilities or service are required and would be secured by the granting of said application."

An understanding of appellants' interpretation and argument requires that one bear in mind that Art. 911b has always required an orchestration of two different factors pertaining to the Commission's handling of motor carrier applications for certificates of public convenience and necessity: (a) the statutory *definition* of the kind of motor carrier eligible to make such an application; and (b) the *categories of information* required by section 10 to be supplied in such application.

The antecedent of Art. 911b *defined* the eligible carriers (Class A motor carriers) in terms of their proposed method of operations, including in the class only those carriers with *fixed* routes and *regular* schedules. Section 10 required the applications made by such carriers to show their proposed "time schedule" and "complete route or routes." While admitting that the Class A carriers were abolished as a class by an amendment, appellants argue that section 10 should continue to be interpreted so as to fix upon applicants the old operational limitations of fixed routes and regular schedules. Appellee disagrees.

Article 911b is a patchwork statute providing for the State's regulation of motor vehicle operations for gain, when they are conducted within the state, upon its roads, and outside incorporated cities, towns and villages. In the provisions of this article appellee finds a delegation of express or implied authority allowing the Commission to consider and determine appellee's application, as in the ordinary case of a common carrier seeking a certificate of convenience and necessity. On the other hand, appellants argue vigorously that these same statutory provisions confer no such express or implied authority upon the Commission, with respect at least to the manner of operation proposed in appellee's application.

The Commission's hearings examiner agreed with appellee's interpretation of Art. 911b, but the Railroad Commissioners overruled him, upholding appellants' interpretation of the statute. The trial court, in turn, reversed the decision of the Commissioners on this point and remanded the case to the agency for a determination of the application on its merits. Appellants and appellee seem to assume that the pertinent provisions of Art. 911b are *ambiguous* and urge this Court to adopt a judicial construction consistent with their respective views of legislative intent, as that intent is allegedly manifested in matters outside the language of the statute as it is presently written.

We hold, however, that the pertinent parts of Art. 911b relied upon by appellants are unambiguous when read with the remainder of the statute. Appellants' argument and reasoning depend upon the ambiguity of section 10(2) ("complete route or routes") and section 10(3) ("proposed schedule of service"). If these phrases are unambiguous, as we hold them to be, there would be little or no room for any judicial construction.

The phrases would be ambiguous only if susceptible to two or more *reasonable* interpretations when read in context. Appellants argue that the phrase "complete route or routes" means *only* a "fixed" route or routes, and that the phrase "proposed schedule of service" means *only* a "time schedule" having "fixed" arrival and departure times. We think these inflexible interpretations are unreasonable for several reasons.

Appellants' reasoning is founded solely upon the proposition that the Legislature, in using these two phrases in section 10, intended that common carriers *remain* subject to the limitations of "fixed routes" and "time schedules" after an amendment of the section in 1931, notwithstanding the amendment removed these operational limitations from the one class of common carrier to which they were applicable, the Class A common carrier. Such an interpretation is unreasonable. *McInnis v. State*, 603 S.W.2d 179 (Tex.1980).

Further, the words used in the two provisions quoted above are not ambiguous when considered in context. Sections 4, 8, and 9 of Art. 911b give the Commission power and discretion in a wide variety of administrative matters. The inflexible interpreta-

tion proposed by appellants would negate the comprehensive and flexible powers given the Commission by these and other sections. Section 4, for example, provides in part as follows:

"Sec. 4. (a) The Commission is hereby vested with power and authority and it is hereby made its duty to supervise and regulate the transportation of property for compensation or hire by motor vehicle on any public highway in this State ... to prescribe all rules and regulations necessary for the government of motor carriers ... *to prescribe the schedules and services of motor carriers operating as common carriers*, and to supervise and regulate motor carriers in all matters affecting the relationship between such carriers and the shipping public whether herein specifically mentioned or not." (Emphasis added).

■ Reading the sections of Art. 911b together, the meaning of section 10 becomes very plain. It requires the applicant to furnish sufficiently-detailed information about its proposed routes and services so that (a) the Commission may intelligently apply the substantive parts of Art. 911b in making a decision whether to grant the certificate of convenience and necessity; and (b) opposing carriers and other interested persons may have fair notice of the relevant issues of fact and law raised by the application, as well as notice of whether and how they are affected by the application. In addition, the Commission is empowered to promulgate reasonable rules and regulations governing the routes and schedules upon which common carriers may operate.

■ We hold, therefore, that sections 10(2) and 10(3) are not ambiguous and that the trial court correctly interpreted Art. 911b in reversing the Commissioners' decision and remanding the case.

Assuming, *arguendo*, that sections 10(2) and 10(3) are ambiguous, we believe that the proper interpretation of those two sections leads to the same result. Appellants' position in this Court is predicated upon the proposition that these two sections require an inquiry into legislative intent, as manifested in earlier versions of Art. 911b. This inquiry leads the Court to the same conclusion: the Commission has the authority to consider the character of application filed by appellee.

The Texas Motor Carrier Act was first enacted in 1929 and codified as Article 911b. 1929 Tex.Gen.Laws, ch. 314, p. 698. While this Act was amended many times, only the 1931 and 1941 amendments are directly useful in interpreting the present statute in this particular case. *See* 1941 Tex.Gen. Laws. ch. 442, p. 713; 1931 Tex.Gen.Laws, ch. 277, p. 480. Hereinafter reference to the original act and the two amendments will be by the year of their passage.

## THE 1929 ENACTMENT

The 1929 Act provided for two categories of motor carriers: Class A carriers and Class B carriers. *Both* categories were "declared to be *common* carriers and subject to regulation by the State of Texas." (Emphasis supplied). Class A carriers were defined in the Act as carriers operating "over fixed routes, under regular schedules and having fixed termini and receiving compensation or hire for such service in accordance with published rates and tariffs." Class A carriers operated under *certificates* issued by the Commission for "the public convenience and necessity." Applications for Class A certificates were required to contain, among other things, a statement of the "complete route or routes over which the applicant desire[d] to operate," a "proposed time schedule and a schedule of rates to be charged between the several points or localities to be served," and a map "showing the route or routes, over which the applicant desire[d] to operate." In addition, the map had to point out existing services and facilities affected by the proposed service, the inadequacy of existing service or facilities, and how granting the application would cure or relieve such inadequacies. The Commission was directed to hold a hearing, after notice, and to grant the application if it were found to be in the public convenience and necessity to do so.

Class B carriers were defined as "motor carriers ... [operating] between two or more incorporated cities, towns or villages, [*without*] fixed routes [,] regular schedules or fixed termini or published rates." Class B carriers operated under a *"permit* from the Commission to engage in such business." Applications for such permits were required to state, among other things, "the nature of the transportation in which the applicant wishe[d] to engage, stating substantially the territory to be covered by the operation," and that it was "not the intention of the applicant to operate regularly on schedules or to engage in the character of transportation defined in the definition of a Class 'A' motor carrier." No hearing was required to be held before issuance of permits to Class B carriers. The statute required only that Class B carriers comply with the requirements of the Act and "the general law," and that they confine their operations to those specified for Class B carriers.

The 1929 Act became effective 90 days after adjournment, or June 13, 1929. Immediately thereafter the Attorney General of Texas was asked to interpret various provisions in the Act. *See* Tex. Att'y Gen. Op. 2776 (To Honorable Mark Marshall, June 26, 1929). The attorney general determined that Class A motor carrier certificates were available only for those motor carriers who had fixed routes, regular schedules, fixed termini, and published rates and tariffs. Further, each and every one of these elements had to be present before an applicant could obtain a certificate of public convenience and necessity. To clarify any confusion as to its meaning, the attorney general defined "regular schedules" as "those [*sic*] that occur at regular intervals, whether hourly, daily, weekly, or monthly, and the number or time intervening between the same is a matter to be determined or approved by the Commission."

The attorney general's opinion also clarified the requirements for obtaining a permit to operate as a Class B motor carrier. A Class B carrier was defined as a motor carrier having none of the operational elements of a Class A carrier. Therefore, if a carrier had fixed rates, a regular schedule, fixed termini, and published rates, or any *one* of these elements, he could not obtain a permit to operate as a Class B carrier.

In addition, the attorney general was asked whether the Act applied to a motor carrier transporting newspapers under a contract with the publisher. In answering the question in the negative, the attorney general looked at the two classes of carrier, *both of which were statutorily defined as "common carriers."* He said:

"[A]s we have already seen, Class 'A' carriers must have each and every one of the four characteristics named, and a Class 'B' carrier cannot have any of the characteristics. A contractor with a newspaper publishing company to deliver papers between incorporated cities necessarily has fixed routes, but *it would be impracticable* to require this contractor to have fixed termini, regular schedules, and to publish the amount of compensation he receives under his private contract, and thereby make him assume the character of a common carrier.

If this act is otherwise construed, we will be placing upon private carriers the same burdens as placed upon common carriers. We cannot believe that the Legislature intended to do this. If so, then there arises the question of its right to do so." (Emphasis supplied).

In defining legislative intent, the attorney general looked both to the practicalities of the matter and to the then-current constitutional doctrine applicable to carriers who operated under private contract with a few shippers. The constitutional doctrine was enunciated in *Frost v. Railroad Commission*, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926), and *Michigan Public Utilities Commission v. Duke*, 266 U.S. 570, 45 S.Ct. 191, 69 L.Ed. 445 (1924). In these cases, the Supreme Court held that a state could not convert private carriers involuntarily into common carriers, through legislative regulation; to do so would violate the Due Process Clause of the Fourteenth Amendment.

The Court held that states have only limited powers to impose conditions on the granting of motor carrier privileges to private carriers.

The attorney general's opinion concluded as follows:

"We conclude, therefore, in view of the provisions of Section 2 of the act in question and the decisions of the Supreme Court of the United States, it was not the intention of the Legislature to regulate private carriers. We do not mean to say that the Legislature is without authority to regulate the use of motor vehicles by private carriers on the public highway, but we do say that the same has not been done in this act."

## THE 1931 AMENDMENT

In the very next session, the Legislature responded directly to the attorney general's opinion, including his invitation to bring "private" carriers under State regulation. The 1931 amendment provided for three different categories of motor carriers in lieu of the old Class A and Class B motor carriers. The new categories were denominated the "common carrier," the "special-commodity carrier," and the "contract carrier."

■ *Common Carriers.* While Class A and Class B carriers were declared to be "common carriers" in the 1929 Act, the 1931 amendment simply made "common carriers" a separate category of motor carrier and abolished the Class A and Class B categories. The 1931 amendment did not define "common carrier"; therefore, it is necessary to look at the common law meaning of the term. "Common carrier" designates a person engaged in transporting people or things from place to place for hire, and who holds himself out to the *public* to do so for so long as he has room to carry the cargo tendered to him. *Burnett v. Riter*, 276 S.W. 347 (Tex.Civ.App.—Beaumont 1925, no writ). Section 5 of the 1931 amendment provided that common carriers were to operate under authority of a certificate of *"public* convenience and necessity" issued by the Commission. (Emphasis supplied). Thus, it is plain that such carriers were

defined solely by whether they served the public generally, and not by their operational characteristics as had been the case in 1929.

Under the 1931 amendment, an application for a "common carrier" certificate of public convenience and necessity was required under section 10(3) to state a "proposed schedule of *service*" in lieu of stating a *"time* schedule" as the 1929 Act required. The word "service" had been used in several sections of the 1929 Act in reference to the combined elements of routes, frequency of transportation, and territory of operation. These were retained in the 1931 amendment. In section 10(3) the word "service" was added and the word "time" was deleted, resulting in the phrase "schedule of service," a phrase that palpably alleviated the rigidity formerly placed on the Commission and the applicants under the 1929 Act. The new phrase allowed for a more practical and flexible application of Art. 911b to motor carriers who operated in a wide variety of ways. The phrase "schedule of rates" in section 10(3) was not changed.

*Special-commodity Carriers.* The 1931 amendment added the category of "special-commodity carriers." This category of motor carrier was defined, in part, by the kind of cargo carried. Section 6(d) of the amendment empowered the Commission to issue *permits* to these carriers upon such terms as the agency deemed proper. "Special-commodity carriers" could be authorized to transport livestock, mohair, wool, milk, livestock feedstuffs, household goods, oil field equipment, timber in its natural state, farm machinery and grain. By allowing these carriers to operate on a *permit* issued by the Commission, the amendment implied that they did not have to meet the more rigorous requirements applicable to those other common carriers seeking *certificates* of public convenience and necessity.

*Contract Carriers.* The 1931 amendment created a category denominated "contract carriers" and for the first time subjected them to State regulation. This amendment was in response to the attorney general's opinion that "private carriers" were not

subject to such regulation under the 1929 Act. The amendment defined "contract carrier" to mean "any motor carrier ... transporting property for compensation or hire over any highway in this State *other than as a common carrier*". Thus, the amendment defined these carriers also on the basis of the shippers served by them and not on the basis of the routes traveled by them or their times of arrival and departure. In sum, "common carriers" served the public generally and "contract carriers" did not. In the case of each category, the Legislature completely changed the basis of classification from operational characteristics to the character of the shippers proposed to be served by the carrier.

Section 6 of the 1931 amendment prohibited any contract carrier from operating in the state until it had received a *permit* from the Commission to do so. The same section specified the contents of an application for a contract carrier permit. They were much simpler than the contents required in a common carrier's application for a certificate of public convenience and necessity.

### THE 1941 AMENDMENT

As the Motor Carrier Act existed after 1931, it allowed "special permits" to be issued to "special-commodity carriers" merely upon "such terms, conditions and restrictions as the Railroad Commission may deem proper ..." which, in effect, required a showing relative only to such matters as traffic safety and road conservation. In contrast, common carriers were required on the face of the statute to make the more onerous showing that the public convenience and necessity justified any new service proposed by that category of motor carrier. This situation ostensibly created a competitive advantage in the "special-commodity carriers" relative to the few enumerated cargoes they could carry. This advantage may not have been one that actually occurred to any great extent, however, for the attorney general had issued an opinion that a "special-commodity carrier" must *also* follow the statutory provisions applicable either to common carriers or con-

tract carriers, according to the conduct of his operations in actual practice. *Stephenson v. Binford*, 287 U.S. 251, 277, 53 S.Ct. 181, 189, 77 L.Ed. 288 (1932). Nevertheless, the controversy carried over until this Court's decision in *Texas & Pac. Ry. v. Railroad Commission*, 138 S.W.2d 927 (Tex. Civ.App.—Austin 1940), *rev'd as moot*, 138 Tex. 148, 157 S.W.2d 622 (1942); and thereafter until passage of the 1941 amendment.

The 1941 amendment re-named the "special-commodity carriers," denominating them "specialized motor carriers." It expressly directed the Commission to conduct hearings before issuance of "certificates" to such carriers (in lieu of the earlier "special permits"), and to require a showing "by substantial evidence that there exists ... a public necessity for such service, and that ... public convenience will be promoted by the granting of said application." The application for such certificate was required to set forth the commodity or commodities, from the statutory list of permissible cargoes, proposed to be transported by the applicant, the specific territory to be served, and the points between which shipments would be made. The amendment required that a map accompany the application, showing such territory and pointing out the inadequacy of existing transportation facilities or service and how adequate facilities and service would result from granting the application. These detailed requirements were, of course, designed to adjust the competitive relationship between the special-commodity carriers and the other regulated carriers in the limited kinds of cargo permitted the former by the statute. *See* 1941 Tex.Gen.Laws, ch. 442, § 1, p. 713.

Despite the legislative adjustment of these competitive tensions, and the attendant clarification of the Motor Carrier Act, the 1941 amendment was immediately criticized as badly "mutilating" the Act by "failing to distinguish carefully between the kind of service performed by the common-carrier motor vehicle and that performed by the contract carrier and, in turn, the character of showing required of each [in a hearing on its application]." Bailey,

*Motor Truck Certificates and Permits in Texas: Common Carrier versus Contract Carrier*, 20 Texas L.Rev. 323, 329 (1942). *See generally* Bailey, *Motor Vehicle Certificates and Permits in Texas: Procedure Before the Commission*, 21 Texas L.Rev. 590 (1943); Bailey, *Motor Truck Certificates and Permits in Texas*, 20 Texas L.Rev. 165 (1941).

## DISCUSSION

Appellants contend that the Commission has no jurisdiction to consider an application of a common carrier which proposes operations conducted "over irregular routes and on irregular schedules." Appellants draw this inference from several sources.

Appellants point out that section 1 of the 1941 amendment declared it to be the policy of the Legislature to create a class of *common* carriers (specialized motor carriers) operating on the highways of the state "over *irregular* routes on *irregular* schedules with 'specialized equipment'. . . ." They contend that this specific reference to a class of common carriers operating over irregular routes, on irregular schedules, implies the general class of common carriers could not at that time lawfully operate over irregular routes and on irregular schedules. They point further to a subsequent part of section 1 of the 1941 amendment which states that it is the policy of the Legislature to "preserve the common carriers serving the public in the transportation of commodities generally over regular routes. . . ." Appellants reason that if common carriers were *not* restricted to "regular routes," then this statement of policy would be unnecessary. It might also be said that this policy statement demonstrates the Legislature's intent to reserve for *itself* a determination as to when, and under what conditions, a common carrier might operate over irregular routes and on irregular schedules, with the necessary implication that the power of making this decision has never been delegated to the Commission.

After carefully weighing appellants' contention, we conclude that the references to "regular routes," "irregular routes," and "irregular schedules" in the 1941 amendment do not imply that "irregular routes and irregular schedules" were by law forbidden to common carriers at the time. Rather, the Legislature was simply stating the general practice of most common carriers who did in fact operate on regular routes and schedules.

When regulatory agencies are delegated broad and general powers, existing statutory provisions do not always address a particular issue or give sufficient guidance for handling such an issue. In fact, legitimate differences of opinion often arise about whether the statute does or does not address the issue or give adequate guidance for adjusting or resolving it. *See Texas & Pac. Ry. v. Railroad Commission, supra.* When judicial resolutions of the issue are unsatisfactory, the Legislature must intervene and address the issue in a form that finally resolves or adjusts the dispute. *See* Jaffe, *Judicial Control of Administrative Agency Action*, 41 *et seq.* (1965).

It was because of the dispute manifested in *Texas & Pac. Ry. v. Railroad Commission, supra*, that the Legislature amended Art. 911b in 1941. This amendment was enacted to clarify several aspects of the statutory provisions pertaining to specialized motor carrier operations. Among these were the issue of whether a hearing was required before issuance of "special permits" to such carriers, what showing was required to be made in such a hearing, what cargoes these carriers could transport, and what was to be the competitive relationship between such carriers and common carriers generally. *See Texas & Pac. Ry. v. Railroad Commission, supra*, and Bailey, 20 Texas L.Rev. 323. The 1941 amendment made clear that the Legislature wished to diminish competition between specialized motor carriers and common carriers generally, by limiting permissible cargoes, restricting these cargoes to those requiring special equipment for handling and transporting, and explicitly providing that the Commission shall not grant certificates to specialized motor carriers if the service of any authorized and adequate common carrier ser-

vice will be impaired as a result. Such severe limitations upon specialized motor carriers would, in practice, have the effect of preserving "the common carriers ... of commodities generally over regular routes," which is the declaration of policy so strongly relied upon by appellants here. There is no basis, however, for drawing from the 1941 amendment the inference appellants contend is there, which is that the 1941 amendment should be understood as a declaration of preexisting statutory law, going back ten years in time, which limits common carriers to regular routes and regular schedules.

Appellants also point to this Court's decision in *Railroad Commission v. Central Freight Lines, Inc.*, 434 S.W.2d 911 (Tex. Civ.App.—Austin 1968, writ ref'd n. r. e.), as authority for the proposition that certificates permitting operations over irregular routes are not authorized by Art. 911b. In that case, an amendment to a Limited Common Carrier Certificate was granted by the Commission, allowing the applicant, Bilbo, to transport gypsum-related commodities "on a call and demand basis on irregular schedules over any and all of the highways named in his Certificate." 434 S.W.2d at 913. The order granting the amendment was appealed to the district court, which held the amendment was an unauthorized act because it permitted Bilbo to operate over "irregular routes of a type and kind not authorized by Art. 911b...."

This Court affirmed the trial court judgment, relying heavily upon Attorney General Opinion No. 0–2608 which concluded that a certificate may not be issued by the Commission purporting to authorize the transportation of general commodities on routes that are not fixed. This opinion of the attorney general presumes that the roads contemplated by an "irregular route" applicant are not specified in its application and from that premise reasons that without such specification, "it would be impossible to determine ... whether there is any need of the proposed new service, and impossible to identify any competing carrier." The attorney general's premise is not universally true. We note that appellee's application

identified all possible routes; therefore, the attorney general's premise and reasoning are irrelevant here.

We disagree with and decline to follow several aspects of the reasoning reflected in *Bilbo.* The *Bilbo* Court made a comparison of the "irregular route" element of "specialized motor carriers" and the "complete route or routes" requirement contained in section 10(2). In so doing, the Court gratuitously incorporated the word "regular" into section 10(2), thereby *adding* a requirement not placed there by the Legislature. Indeed the term "regular route" has not been used in Art. 911b since deleted from the statute when the 1931 amendment abolished the categories of Class A and Class B carriers. Further, the fundamental questions raised in this appeal have almost no similarity to the questions raised in *Bilbo.*

Appellants place a good deal of reliance upon certain language in the opinion of the Supreme Court of Texas in *Alamo Express, Inc. v. Railroad Commission*, 407 S.W.2d 479 (Tex.1966). That opinion repeats many times the phrase "regular route" in speaking of common carriers generally, as opposed to special-commodity carriers and specialized motor carriers, under the 1931 and 1941 amendments respectively. Nothing in the Supreme Court's opinion, tracing the history of Art. 911b, indicates that common carriers were *confined by common or statutory law* to operations on regular routes and regular schedules, notwithstanding what the custom may have been among the general class of common carriers.

■ We regard the Supreme Court's references to "regular route common carriers" as descriptive of the *character of operations* of most common carriers in comparison to the mode of operation specified for special-commodity carriers and specialized motor carriers. If the Court had intended to say that common carriers were barred by law from operating on irregular routes and on irregular schedules, we feel that it would have expressly said so and not left the matter to be inferred. It probably did not do so for the reason that it recognized that

under Art. 911b, "common carriers" are *defined* by whether they serve the public generally, and not by any other aspect of their operation, their manner of operation being left to the Commission's regulation. While the references to "regular route common carriers" appear to be useful for the Court's purposes in that opinion, in comparing the respective requirements of sections 5a(a), (c) and 10 of Art. 911b, we believe that the phrase was not intended to imply that a legal impediment existed to prevent common carriers from operating on routes that were not fixed.

Appellee places a good deal of reliance upon the deletion of the word "time" from section 10 of the statute, and the substitution of the word "service" in the 1931 amendment, so that section 10(3) of Art. 911b now requires that applicants for common carrier certificates set forth a "proposed *schedule of service* and a schedule of rates to be charged ..." Before that amendment, such applicants were required to set forth a "proposed time schedule." Appellee states that this change was made to accommodate common carriers who may wish to operate upon irregular schedules, as it desires to do.

Appellants contend, however, that the change in section 10(3) resulted from an "insignificant interlineation." The imputation of "insignificant" is made on the proposition that the word "schedule" includes the concept of "time"; hence, the Legislature deleted the word "time" to cure this intrinsic redundancy, intending nevertheless that the meaning of "time schedule" should survive the amendment's deletion of the word "time."[3]

We disagree with appellants' interpretation on several grounds apart from etymology. They ignore the fact that the Legislature supplied the words "of services," indicating some further substantive change was intended. In addition, the phrase in question is followed immediately by the phrase "schedule of rates," in both the 1929 Act and the 1931 amendment, a matter in which the element of "time" would have no meaning. The change demonstrates that the Legislature was using the word "schedule" in both cases to mean a supplemental and detailed description in reference both to services and to rates. More importantly, it appears to us that the Legislature was responding to the attorney general's 1929 ruling that a motor carrier was required to operate purely as a Class A or Class B carrier, and that it must have all the operational aspects of one class and none of the other. In general, the 1931 amendment of section 10 and the other provisions of the amendment reflect that the Legislature was responding in a fundamental way to remedy the problems raised by the attorney general's ruling. In our view, the Legislature's use of the word "service" demonstrates a departure from the rigidity of the 1929 Act, resulting from the attorney general's opinion, in favor of giving the Commission more flexibility and accommodating common carriers who may propose to serve the public in a wide variety of ways.

Contrary to appellants' claim of intrinsic redundancy, we cannot assume that the 1929 Legislature inserted the word "time" for no purpose at all. Every word is presumed to have some meaning in a statute of this kind. *Riverside National Bank v. Lewis*, 603 S.W.2d 169 (Tex.1980). The deletion of the word "time" by the 1931 Legislature has even more significance since the amendment of that year also created the new and separate category of "common carrier," defined by its service to the public generally and not by any schedule.

Appellants' explanation of the change is accompanied by no support in our view. This has been the only change in section

---

**3.** While it is true, as appellants state, that the word "schedule" has the accepted meaning in current usage equivalent to "timetable," that is merely one, and not even the first, among several accepted meanings of the word "schedule." From the 16th Century to the present, the word "schedule" has been used to mean an

explanatory writing containing a statement of details. See, e. g., *The Compact Edition of the Oxford English Dictionary*, Oxford University Press (1971). This meaning of the word "schedule" is rather clearly the meaning intended by the Legislature in section 10(3).

10(3) since its original enactment in 1929. More importantly, the old provision of section 10(3) calling for a "time schedule" was *repealed* along with other parts of the 1929 Act, including the definitional element of "regular schedules" applicable to Class A carriers. It would be unreasonable of us now to retain the restrictions of "time schedule" and "regular schedule" in section 10(3), so that common carriers remain subject to these operational limitations even though they have been repealed. *McInnis v. State, supra.* Similarly, the definitional element of "fixed routes" applicable to Class A carriers in 1929 was *repealed* in 1931. It would also be unreasonable of us now to read this operational limitation back into Art. 911b, via section 10(2), in the face of that repeal.

Finally, appellants argue that we should observe and give effect to the interpretation placed upon Art. 911b by the Commission, which appellants contend is one prohibiting common carriers from operating on irregular routes and irregular schedules. The administrative interpretation in this case is not free from doubt.

Even if appellants correctly state the Commission's interpretation, we are not required to follow that interpretation. The Commission is a "statutory body having only such powers as are expressly granted or are necessary to effectuate the objectives of those expressly granted." *Railroad Commission v. Red Arrow Freight Lines,* 96 S.W.2d 735 (Tex.Civ.App.—Austin 1936, writ ref'd). The Commission's view of its statutory authority and duty is important when the agency is confronted with the problem of administering an ambiguous statute, but its view is never binding on the judiciary and its *view can never stand in the face of the plain meaning of a statute* that directs it to do one thing or another. *Brown Express, Inc. v. Railroad Commission,* 415 S.W.2d 394 (Tex.1967). We consider the pertinent provisions of Art. 911b to be unambiguous, but assuming *arguendo* that they are ambiguous, we decline to follow the interpretation ostensibly given them by the Commission, believing that in-

terpretation to be plainly erroneous. We believe our interpretation of Art. 911b is more consistent with the general, comprehensive and flexible powers given the Commission by the Legislature in motor carrier matters, as set out in sections 4, 8 and 9 of the statute.

In sum, appellants contend generally in this appeal that there is a rule of law which bars the Commission from considering an application by a common carrier which proposes operations conducted "over irregular routes and on irregular schedules." They find this rule of law, so far as we can tell, entirely in inferences which they draw from various judicial opinions discussed above, and from statutory enactments. We believe that these inferences are, in large part, insubstantial. Appellants cite no authority whatever which directly and positively enunciates the rule of law for which they contend. We find no such authority ourselves and believe that none exists. Appellants' view is one of a narrow and inflexible delegation of power to the Commission, in contrast to the comprehensive and flexible powers we see expressly stated in different sections of the statute. We cannot believe that the Legislature intended the result argued for by appellants.

We hold, therefore, that the trial court did not err in remanding the case to the Commission with instructions to proceed to hear the case in its entirety, on the merits.

Concerning appellants' contention that the trial court erred in "finding" certain facts to be true, we believe that the trial court properly "deemed" these matters to be true for the limited purpose of evaluating the legal sufficiency of appellee's application to the Commission, and evaluating the contrary contentions of the parties relative to the power of the Commission to consider that application. The power of the Commission to receive and weigh evidence on these matters and its right to make its own evidentiary determinations thereon when it considers the application on its merits were obviously not intended to be precluded by the trial court's "findings" of fact made for the limited purposes specified by

it and described herein. Further appellants have not been prejudiced by these "findings" of fact.

We affirm the judgment of the trial court.

Affirmed.