2011 OK CIV APP 65

**OKFUSKEE COUNTY RURAL WATER DISTRICT NO. 3, an agency of the State of Oklahoma, Plaintiff/Counter–Defendant/Appellant/Counter–Appellee,**

v.

**The CITY OF OKEMAH, a municipal corporation, and Okemah Utilities Authority, a public trust, Defendants/Counter–Plaintiffs/Appellees/Counter–Appellants.**

No. 107,680.

Court of Civil Appeals of Oklahoma, Division No. 3.

Jan. 28, 2011.

Certiorari Denied May 16, 2011.

 ————————

David H. Cole, Edmonds Cole Law Firm, Oklahoma City, Oklahoma, and Marjorie

Galt, Galt Law Office, Oklahoma City, Oklahoma, for Plaintiff/Counter–Defendant/Appellant/Counter–Appellee.

David L. Weatherford, Birmingham, Morley, Weatherford & Priore, P.A., Tulsa, Oklahoma, and Bruce A. Coker, Bruce A. Coker & Associates, Okemah, Oklahoma, for Defendants/Counter–Plaintiffs/Appellees/Counter–Appellants.

KENNETH L. BUETTNER, Judge.

¶ 1 Plaintiff/Counter–Defendant/Appellant/Counter–Appellee Okfuskee County Rural Water District No.3 ("RWD3") and Defendants/Counter–Plaintiffs/Appellees/Counter–Appellants the City of Okemah (City) and Okemah Utilities Authority (Authority) appeal various provisions of a judgment entered following a bench trial. RWD3 purchased water from Authority under a contract entered in 1983. RWD3 claimed that since 2002, City and Authority breached the purchase contract and violated state law in setting the rate RWD3 paid for water. The trial court found that City was not liable, but that Authority had overcharged RWD3 under the terms of the contract and had violated a statute requiring a certain type of accounting in setting the rate. The court limited damages to amounts incurred since RWD3's Petition. We affirm the trial court's findings that City is not liable, that 11 O.S.2001 § 37–119(B) and 11 O.S.2001 § 37–119a are applicable to the parties' contract, and that Authority had breached the contract by overcharging RWD3. However, the trial court erred in limiting RWD3's damages to those incurred since the Petition and in setting the amount RWD3 was overcharged due to Authority's breach. We reverse and remand with directions to enter an award of damages in accordance with this opinion.

¶ 2 In its May 26, 2006 Petition, RWD3 asserted that it entered a Water Purchase Contract with City and Authority in 1983. RWD3 asserted the parties later entered a "Modification of Water Purchase Contract" in 1989 and an "Addendum to Amended Water Purchase Contract" in 1999. RWD3 asserted that the agreements were subject to 11 O.S.Supp.1994 § 37–119(B) and § 37–119a, but that City and Authority failed to comply with those statutes. Specifically, RWD3 asserted City and Authority failed to use an enterprise accounting system to determine the rate charged for water and discriminated against RWD3 in allocating the cost of water between RWD3 and other customers. RWD3 also alleged that City and Authority breached the contract by setting the rates in excess of the amount allowed by statute and by failing to renegotiate the contract to comply with the statute. RWD3 contended City and Authority acted in bad faith and that their refusal to comply with the statute effectively taxed RWD3 without representation. RWD3 sought a declaratory judgment that City and Authority were required to comply with the statute, as well as an order directing City and Authority to comply with the statute, and an award of damages from 2002 forward.

¶ 3 City and Authority filed their Answer and Counterclaim July 7, 2006. They denied RWD3's claims regarding the application of the statute. They agreed that a different Rural Water District (RWD2) paid a lower rate, pursuant to its contract. As affirmative defenses, City and Authority asserted first that the Oklahoma Constitution bars impairment of existing contracts, which they contended would result from applying 11 O.S.Supp.1994 § 37–119 and § 37–119a to modify the existing contract; and second that § 37–119 and § 37–119a are vague and unenforceable as applied to the contract here. In their counterclaim, City and Authority asked for a judgment declaring that the water rates established for RWD3 were in compliance with the contract and with state law.

¶ 4 Prior to trial, the parties submitted a joint stipulation of facts.[1] The trial court

---

1. The parties stipulated: 1) water is an essential public service; 2) in September 1983 Authority and RWD3 entered a Water Purchase Contract which includes a formula for setting the rate charged; 3) in December 1985, Authority entered a contract with RWD2 which provides two water rate formulas from which RWD2 may select; 4) after the 1983 contract between RWD3 and Authority, 11 O.S. § 37–119(B) was amended in 1994; 5) after the 1983 contract between RWD3 and Authority, 11 O.S. § 37–119a was enacted; 6) Authority and RWD3 entered an

conducted a bench trial October 30–31, 2007. The court issued Findings of Fact and Conclusions of Law June 19, 2008, and filed the Journal Entry of Judgment September 28, 2009. The trial court held that City has no liability in this case. The court found that Authority did not follow the contract provisions on rate setting and that RWD3 was therefore overcharged. However, the court found that RWD3's claim for overcharges occurring before it filed its Petition was waived and barred by estoppel and account stated. The court awarded RWD3 $10,895.41 in overcharges incurred between the filing of the Petition and trial. The trial court next found that Authority did not comply with the statutory requirement to use an enterprise accounting system, and it awarded RWD3 $7,500 as "expenses for which it is entitled to be reimbursed for the failure of (Authority) to maintain the required enterprise accounting system." As to RWD3's claims of discrimination, the court found that there was no difference in the "actual cost of production" of water sold to RWD3 and RWD2, but the court found no intentional or illegal discrimination by Authority. The court further found that 11 O.S.Supp.1994 § 37–119(B) applied to modify the contract's rate setting provisions. The court also held that the contract had been modified annually based on its provision for annual recalculation of water rates. Finally, the court found that the parties were not controlled by the Oklahoma Corporation Commission, and Authority did not have the obligations of a public service corporation; therefore, RWD3 was not entitled to be charged the lowest rate that Authority charged to any RWD,

nor was Authority required to contract with or sell water to RWD3.

■■ ¶ 5 We first address Authority's argument that the trial court erred in finding 11 O.S.2001 § 37–119(B) applies to the contract, because the remainder of the judgment hinges on that finding. The statute was amended in 1994, after the parties' 1983 contract. Authority contends that application of the 1994 amendment to the 1983 contract results in a law unconstitutionally impairing an existing contract. Both the Oklahoma and United States Constitutions prohibit the State from passing laws which impair existing contract obligations. Okla. Const. Art. 2, § 15 provides:

> No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed. . . .

U.S. Const. Art. I § 10, cl. 1 provides, in pertinent part:

> No State shall ... pass any ... Law impairing the Obligation of Contracts, . . . .

"(T)he prohibition against impairing the obligation of contracts is not to be read literally . . . . its primary focus was upon legislation that was designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors were unable to satisfy." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 502–3, 107 S.Ct. 1232, 1251, 94 L.Ed.2d 472 (1987). Typically, the test for unconstitutionality is whether a law "substantially" impairs a contract. *Edmondson v. Pearce,* 2004 OK 23, 91 P.3d 605, *cert. denied* by *Tally v. Edmondson,* 543 U.S. 987, 125 S.Ct. 495, 160 L.Ed.2d 371 (2004).

¶ 6 At the time of the 1983 Water Purchase Contract, 11 O.S.1981 § 37–119 re-

---

"Addendum to Amended Water Purchase Contract" in September 1999, which provides for a maximum amount of water RWD3 may purchase and for a surcharge of 15% for excess water purchased; 7) the 1983 contract provides for the rate to be modified each year, and RWD3's rate has been modified each year since 1998; 8) RWD2 and RWD3 are public non-profit entities created pursuant to 82 O.S. § 1324 *et seq.* for the purpose of developing and providing an adequate rural water supply; RWD2 and RWD3 are bodies "politic and corporate and an agency and legally constituted authority of the State of Oklahoma . . ."; 9) RWD2 and RWD3 each purchase water from Authority for resale to customers within their individual territory and each provides its

own water distribution system, meter reading services, individual customer billing, and customer services; 10) the service territories of RWD2 and RWD3 are outside the municipal corporate limits of Okemah; 11) costs attributable to Authority's sewer system are not costs which are attributable to Authority's ability to provide water service to RWD3, but pursuant to the 1983 contract, some sewer costs are included in RWD3's water rate; 12) due essentially to differences in their contracts with Authority, RWD2 paid lower rates for water from 1999 through 2007; and 12) there is no difference in the "actual cost of production" of water for RWD2 and RWD3 except for the different points of delivery.

quired only that a municipality's sale of water to those outside the city limits be made by written contract allowing the municipality to abrogate the contract.[2] Section 37–119 was amended in 1984, 1989, 1991, and 1994.[3] The 1983 Water Purchase Contract expressly provided for annual review and modification of the rate charged; it also provided that it was subject to laws applicable to such agreements.[4] The 1994 amendment added two requirements which were not part of, or were in conflict with, the 1983 contract: 1) nondiscriminatory allocation of modified rates between Authority's municipal customers and an outside purchaser such as RWD3; and 2) inclusion of only the costs attributable to maintaining Authority's ability to provide water service to the purchaser in that purchaser's rate.[5]

¶ 7 Authority contends that the amended statute is not applicable to the contract and

2. That version of § 37–119 provided:

A. All contracts for the sale or furnishing of water by a municipality to other municipalities shall be made in the name of the municipality, by the mayor, after approval by the governing body. If the operation and control of the waterworks and water plant is lodged in a special board or commission under a charter provision of any municipality, the contract shall be made in the name of the municipality by the chairman of the board or commission, after approval by the board or commission. All other contracts for the sale and furnishing of water, as provided by Sections 37–119 through 37–122 of this title, shall be executed in the same manner and by the same officer or agent of the municipality as may be authorized by the charter or ordinances of the municipality, or as authorized by a board or commission, for the sale and furnishing of water within the corporate limits of the municipality.

B. All water sold and furnished to persons, firms, and corporations without the corporate limits of the municipality so selling and furnishing the same shall be sold and furnished upon written contracts expressly stating that the contract may be abrogated by the municipality at any time the governing body thereof, or the board or commission operating and controlling the waterworks, shall declare by resolution that the water being furnished under the contract is required by the municipality for its own use and use of its inhabitants.

3. The current version, enacted in 1994, provides in pertinent part:

\* \* \*

B. All such water sold and furnished to persons or public or private entities outside the corporate limits of the municipality shall be sold and furnished upon *written contracts which shall provide for an annual review of the municipality's costs and contract modification of rates to permit rates to be increased or decreased to the purchasers as appropriate. Any modification shall be nondiscriminatorily allocated between the municipality's customers and the purchaser. Provided, however, that only those costs that are attributable to maintaining the ability of the municipality to provide water service to the purchaser shall be included in purchaser's rates.* The contracts shall provide that the persons or public or private entities outside the corporate limits of the municipality shall be subject to a rationing program consistent with any rationing program ordered by the municipality.
(Emphasis added).

4. The 1983 contract included the following passages:

(MODIFICATION OF CONTRACT) That the provisions of this contract pertaining to the schedule of rates to be paid by (RWD3) for water delivered are subject to modification annually on January 1. Any increase or decrease in rates shall be based upon an audit of Authority's books by a Certified Public Accountant selected by the Authority. The audit will be in accordance with generally accepted auditor's standards and shall provide a margin to the Authority above all costs of 10%. This audit to be performed at the end of each fiscal year. A certification by the auditor that any adjustment of rate is required in order to provide a return to the Authority of the margin above specified, whether an increase or a decrease, shall be that rate so certified by said auditor. It is agreed that increased capitalization of the Authority system shall not be included in the costs to be considered by the auditor.

Expenditures directly attributable to maintenance and operation of the Authority's sewer system are hereby fixed at 10% of total operating costs of the Authority, and deductions shall be allowed in such percentage from the Authority's operating costs. A 5% reduction from the water processing costs shall be allowed for miscellaneous expenditures to the water system that are not attributed to the Rural Water Districts. Expenditures directly attributable to the water distribution system shall not be reduced or pro-rated.

\* \* \*

This contract is subject to such rules, regulations or laws as may be applicable to similar agreements in the State of Oklahoma and the Authority and (RWD3) will collaborate in obtaining such permits, certificates or the like, as may be required to comply herewith.

5. As we discuss below, in 1994 the Legislature also added a new statute, 11 O.S.Supp.1994 § 37–119a, which required municipalities selling

that reversal on that ground "precludes any damage award against (Authority) for 'discriminatory' rates in violation of the statute and justifies reversal of the judgment in the amount of $10,895.41." In the judgment, the court found that RWD3 had been overcharged under the terms of the contract, but the court found that Authority did not intentionally or illegally discriminate. It is unclear from the judgment whether the trial court found Authority overcharged RWD3 under the contract as written or under the contract as modified by the amended statute. And, as noted above, if the amended statute applied to the contract, it would effectively modify both discriminatory allocation of costs and the inclusion of costs not attributable to maintaining Authority's ability to provide water service to RWD3. As we explain below, we find that the trial court correctly found that the amended statute is applicable to the contract.

 ¶ 8 The bar on impairment of contracts is not absolute; rather, we must balance the constitutional protection afforded to the contract with the "essential attributes of sovereign power," reserved by states to safeguard the welfare of their citizens. *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 21, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977). In *Edmondson, supra*, the Oklahoma Supreme Court quoted the United States Supreme Court's explanation of the balancing between contractual rights and the State's police power:

[I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States. 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. *This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.'*

2004 OK 23, ¶ 26, 91 P.3d 605, (emphasis added) quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727, 727 (1978). "Police power, also considered an attribute of sovereignty, comprehends the power to make and enforce all reasonable laws and regulations necessary for the advancement and protection of the public welfare. It cannot be invoked except to protect and promote public morals, health, safety and prosperity." *Brannon v. City of Tulsa*, 932 P.2d 44 (1996). Legislation in the exercise of the police power will not be found to unconstitutionally impair contracts where the legislation "is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 438, 54 S.Ct. 231, 240, 78 L.Ed. 413 (1934). The U.S. Supreme Court has long held that the states have authority to safeguard the vital interests of their people and that it does not matter that legislation appropriate to that end has the result of modifying or abrogating contracts already in effect. *City of El Paso v. Simmons*, 379 U.S. 497, 508, 85 S.Ct. 577, 584, 13 L.Ed.2d 446 (1965), citing *Blaisdell, supra*, and *Stephenson v. Binford*, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288 (1932).

¶ 9 RWD3 exists pursuant to the Rural Water, Sewer, Gas and Solid Waste Management Districts Act, 82 O.S.2001 § 1324.1–§ 1324.35, which provides for the establishment of "public nonprofit rural water districts" "for the purpose of developing and providing an adequate rural water supply . . . to serve and meet the needs of rural residents. . . ." 82 O.S.2001 § 1324.3. A petition to establish such a district must be addressed to the county commissioners and must include, among other elements, a statement that area residents are without an adequate water supply, that maintenance of a water

water to outside customers to use an enterprise accounting system, rather than the general accounting principles method required by the par-

ties' 1983 agreement. Authority has not challenged the applicability of § 37–119a.

system is necessary to provide such a supply, and that a rural water supply system "will be conducive to and will promote the public health, convenience, and welfare." 82 O.S. 2001 § 1324.4. The statute at issue in this case, 11 O.S.Supp.1994 § 37–119(B), prescribes the contractual agreement by which a municipality may sell water to a rural water district, which promotes public health and welfare.

¶ 10 The United States Supreme Court has held that in the exercise of its police power, a state is limited only to the extent that it may not pass legislation which repudiates debts, destroys contracts, or denies the means to enforce contractual rights. *City of El Paso, supra,* 379 U.S. at 509, 85 S.Ct. at 584. The amendment to § 37–119(B) does none of those things. Instead, it prescribes terms for calculating the rate (requiring non-discriminatory allocation of only costs attributable to providing water to the purchaser) under a contract already requiring annual calculation of rates, while continuing not only to allow but also to require written contracts for the sale of water from municipalities to those outside the city limits. At the time of the 1983 contract, § 37–119(B) directed that sales of water by municipalities to outside groups must be by written contract. "The state, having authorized such contract, might revoke or modify it at its pleasure." *City of Pawhuska v. Pawhuska Oil & Gas Co.,* 250 U.S. 394, 399, 39 S.Ct. 526, 528, 63 L.Ed. 1054 (1919), quoting *New Orleans v. New Orleans Waterworks Co.,* 142 U.S. 79, 12 S.Ct. 142, 35 L.Ed. 943. Finally, as noted above, the contract provided that it was subject to state law and was subject to modification annually; necessarily the parties should have anticipated that the rate could be modified pursuant to state law.

¶ 11 We find as a matter of law that the statute is an expression of the State's police power, it serves a legitimate public purpose, and does not destroy or even substantially impair the parties' contractual rights.[6] Accordingly, we affirm the trial court's decision that the current version of § 37–119(B) applies to the Water Purchase Contract.

■ ¶ 12 Authority's other claim on appeal is that the trial court erred in finding it violated 11 O.S.2001 § 37–119a by not using an enterprise accounting system to determine the water rate for RWD3. Section 37–119a was first enacted in 1994. It provides:

Beginning July 1, 1996, if a municipality selling water to persons or public or private entities outside its corporate limits has not implemented an enterprise accounting system to account for the cost of water supply, treatment and delivery to the point of delivery to the purchaser's water system, it shall be liable to the purchaser for the reasonable expenses of such an accounting exceeding the expense which the purchaser would have incurred using an enterprise accounting system.

As noted above, the parties' contract required that changes in the rate were to be made based on audits using general accepted auditing principles. Authority does not contend here that this statute impairs the Water Purchase Contract. Instead, Authority complains only that RWD3 failed to present sufficient evidence of the expenses incurred due to Authority's admitted failure to implement an enterprise accounting system.

¶ 13 RWD3 presented Lawrence Thompson as its first witness. Thompson testified that he had long been a consultant on utility rates, had taught courses on public utility rates, had done consulting work with the Oklahoma City Water Utilities Trust, and had in 1992 worked with City to determine water rates for RWD2. Thompson testified [7] that part of his work for RWD3 in this case

---

**6.** While we agree with RWD3's contention that Authority is a public utility, Authority is not controlled by the Corporation Commission and the State does not set rates for rural water districts. Our decision is based on the exercise of the police power and we do not affirm based on RWD3's arguments related to public utilities whose rates are set by the State.

**7.** At the conclusion of RWD3's case, Authority asked the court to dismiss RWD3's claim for reimbursement of audit expenses because RWD3 had not presented evidence of such costs. RWD3 indicated its belief that it would claim the auditor's expenses in its application for costs and fees. The court allowed RWD3 to reopen its case to present evidence of its damages under § 37–119a.

was due to the fact that City and Authority did not have an enterprise accounting system in place. Thompson testified he had billed RWD3 $15,890.99 and he "would say about half of it" was for work performed "because they failed to have the proper accounting system as required by the statute." Counsel stated it had computed half to be $7,945.50 and Thompson answered "(t)hat is a good estimate." Counsel for Authority asked if Thompson would agree that the number was just an estimate and that Thompson did not "have any ability today to tell us how much time you spent on the creation of an accounting system or doing an accounting system versus how much you spent in preparing to be an expert witness in this case; correct?" Thompson responded "I didn't spend any time doing an accounting system, but I spent a lot of time trying to develop useful numbers for rate making from an accounting system that was pretty unfriendly." To which counsel responded: "(i)n fact, that's primarily what you were doing was reviewing the records that were already prepared. You didn't go out, because you're not an accountant, and create an accounting system, did you?" Thompson answered "(n)o, I didn't." Authority restated its request to dismiss the § 37–119a claim, and RWD3 responded that the statute requires the municipality to pay "reasonable expense of such an accounting exceeding the expense which they would have incurred using that particular accounting system," and that Thompson had testified that he performed "services that were in addition to what would have exceeded the expense (*sic*) if they'd had the proper accounting system." Authority's witness, auditor Michael A. Crawford, also testified regarding the enterprise accounting system:

(Counsel for RWD3): Now, this enterprise accounting system, the fact of the matter is that (Authority) does not use an enterprise fund accounting system as you understand the term enterprise accounting system to be? [8]

A: That is accurate.

Q: Had they used an enterprise fund accounting system, as you understand that term, figures to determine cost-based rates would certainly be much easier, would it not?

A: Cost-based rates pursuant to the statute, not the contract?

Q: Yes.

A: Yes. It would make it easier. It doesn't mean it can't be done now, it just means that it would make it easier if you had an enterprise fund-based accounting system.

¶ 14 To the extent that calculating the proper rates would be easier, and therefore less time-consuming, we infer that Crawford conceded that RWD3 incurred expenses due to Authority's failure to implement an enterprise accounting system. The trial court's award of $7,500 for the § 37–119a claim is reasonable based on the evidence offered for the expenses incurred by RWD3 due to Authority's failure to implement the statutory accounting system. We affirm that portion of the judgment.

¶ 15 Having resolved the issues presented in Authority's counter-appeal and finding that the current version of § 37–119(B) is applicable to the parties' contract, we next consider RWD3's claims of error in the judgment. RWD3's first two claims of error address the damages award. RWD3 argues that the trial court erred in limiting its damages to amounts incurred since the filing of the Petition and that the damages award is not supported by the evidence. The evidence showed that Authority had failed to comply with § 37–119(B) since its passage in 1994. RWD3 first demanded compliance in 2002 and Authority insisted that RWD3 file

---

8. Crawford later testified that accountants use the term "enterprise fund accounting" and that he assumes the statute's use of "enterprise accounting system" is intended to mean "enterprise fund accounting." He distinguished enterprise fund accounting from government fund accounting to explain that a purchase in enterprise fund accounting is capitalized and depreciated on the books, while neither would be done for a purchase in a government fund accounting system. Additionally, he explained that borrowed funds are treated as a liability, with the interest as an expense, in enterprise fund accounting system, while in a government fund accounting system, borrowed money is a resource and both principal and interest are considered expenditures.

suit to determine the parties' rights under the contract. Authority's failure to comply with laws applicable to such contracts amounted to a breach of its contractual agreement to comply with such laws. The limitations period for breach of written contract is five years. 12 O.S.2001 § 95(A). The trial court erred in finding that RWD3 had waived any right to damages preceding the filing of its Petition under the doctrine of account stated. RWD3 demanded compliance with the statute since 2002 and it is entitled to damages for Authority's breach of contract within the limitations period. We therefore reverse the trial court's finding of waiver and its award of damages incurred. We further agree with RWD3 that the trial court's damage award for breach of contract is an arbitrary amount not supported by the record. We remand for determination of the proper amount of damages, based on the amount Authority overcharged RWD3 for water pursuant to the terms of § 37–119(B).

¶ 16 RWD3 next claims that discriminatory allocation of costs, as prohibited by § 37–119(B), does not require intent. RWD3's argument in this portion of its brief does not explain what relief it would receive if we reversed the trial court's finding that there was no illegal or intentional discrimination in the allocation of rates. We decline to review the trial court's finding of fact on this issue.

¶ 17 Lastly, RWD3 contends the trial court erred in finding City was not liable. RWD3 asserts that in the Joint Stipulation of Facts, City and Authority stipulated to their actions as one entity and are therefore both bound to the stipulated facts which establish liability.[9] The document titled Joint Stipulated Facts, filed October 18, 2007, indicates that it is submitted by RWD3 and "the Defendants, the City of Okemah, a municipal corporation, and Okemah Utilities Authority, a public trust ("Okemah")". The label "Okemah" in the introduction to the stipulations is adjacent to Authority's name, and the trial court reasonably could have interpreted "Okemah" as referring only to

Authority. The identifier includes no language such as "collectively" to indicate that "Okemah" referred to both Defendants. We find added support for this view in that all but one of the stipulations involve acts taken by Authority only (entering water purchase contracts and operating a water and sewer system). Stipulated fact no. 10 states: "Both (RWD3)'s and (RWD2)'s service territories are located outside of the municipal corporate limits of Okemah." This stipulation can only apply to City because Authority, as a trust, has no corporate limits.

> A court may in its sound discretion relieve against a stipulation entered into through mistake or misunderstanding of fact ....; or entered into inadvertently, inadvisedly, or improvidently, where under all the circumstances its enforcement would work an injustice.... It cannot be said that the court abused its discretion in relieving against this stipulation.

*Bradford v. Schmucker*, 135 F.2d 991, 996 (10th Cir.1943) (citations omitted).

¶ 18 The 1983 Water Purchase Contract plainly shows it was made by Authority and RWD3. Authority is a public trust which is presumed to "(e)xist as a legal entity separate and distinct from the settlor and from the governmental entity that is its beneficiary." 60 O.S.2001 § 176.1(A). We find no error in the trial court's order that City, which is not a party to the contract, is not liable in this case.

¶ 19 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.

MITCHELL, P.J., and JOPLIN, J., concur.

---

9. We have listed the stipulations above at footnote 1.